DEVEX CORPORATION et al., Plaintiffs-
Appellants,

v.

GENERAL MOTORS CORPORATION
et al., Defendants-Appellees.

No. 13979.

United States Court of Appeals
Seventh Circuit.

July 12, 1963.

Rehearing Denied Sept. 4, 1963.

Frank H. Marks, Chicago, Ill., William
C. McCoy, Jr., Cleveland, Ohio, Walter J.
Blenko, Pittsburgh, Pa., for appellant.

Arthur W. Dickey and Neal A. Wal-
drop, Detroit, Mich., for defendant Gen-
eral Motors Corporation.

Benjamin H. Sherman, Carlton Hill,
Chicago, Ill., for defendant-appellee, Hou-
daille Industries, Inc.

George N. Hibben and Jerome F. Fal-
lon, Chicago, Ill., for other appellees.

Before DUFFY and SWYGERT, Cir-
cuit Judges, and MAJOR, Senior Circuit
Judge.

DUFFY, Circuit Judge.

These are two civil suits for infringe-
ment of Henricks' Reissue Patent No.
24,017 which were consolidated for trial
on the common issue of validity. Claim 4
is the only claim at issue.[1] The District
Court held Claim 4 of the patent in suit

---

1. Claim 4 reads:
  "4. The process of working ferrous
metal which comprises forming on the
surface of the metal a phosphate coating
and superimposing thereon a fixed film
of a composition comprising a solid melt-
able organic binding material containing
distributed therethrough a solid inorganic
compound meltable at a temperature be-
low the melting point of the ferrous
metal phosphate of said coating and hav-
ing a hardness not exceeding 5 on the
Mohs' hardness scale, and thereafter de-
forming the metal."

to be invalid in view of the indefiniteness of the claim, the prior art and prior public use.

The patent in suit relates to lubrication of metal surfaces in cold drawing and deforming operations in shaping steel to desired forms by dies, to reduce friction between the steel workpiece being drawn or shaped and the die, to avoid scoring and tearing of the metal being drawn and to avoid injury to the surface of the dies.

The patent in suit is the outcome of an application, Serial No. 665,905, filed April 29, 1946 by the patentee Henricks, which was abandoned in favor of a continuation-in-part application filed October 31, 1950, upon which was issued United States Patent No. 2,588,234, dated March 4, 1952, for which application for reissue was filed March 1, 1954, upon which Re. Patent No. 24,017 now in suit issued on June 7, 1955.

Claim 4, the only claim in issue, is identical to Claim 45 as allowed by the Patent Office in the 1946 application. April 29, 1946, the date when the 1946 application was filed, is therefore the record date of invention to which the patentee is entitled.

The patent in suit relates particularly to the lubrication of metal for drawing and forming operations. It concerns cold forming operations as opposed to hot forming operations. When metal is drawn or deformed, to transform a blank or workpiece into another desired shape, there is necessarily some movement between the surface of the blank and the surface of the die, and an accompanying generation of high pressures and temperatures. Adequate lubrication is essential. Unless suitable provision for lubricating the surfaces is made, tearing of the metal or galling of the dies results. The problem is most acute where difficult draws of ferrous metals are involved. Drawing operations require costly tools and dies. It follows that wear and abrasion are very important considerations in tool and die work.

Among the suggestions contained in the patent in suit is that of providing upon the surface of the work to be drawn, an integral phosphate coating and applying thereto a film of sodium tallow soap having borax distributed therein. It is contended that a solid meltable organic binding material mentioned in Claim 4 includes sodium tallow soap and that a solid inorganic compound mentioned in the claim includes borax.

Mohs' hardness scale is a known standard for indicating the relative hardness of materials. It is used in Claim 4 as a specification that the "solid inorganic compound" of the claim should not be hard enough to scratch the steel being drawn.

The prior art disclosed a number of lubricating schemes. These included the use of ordinary lubricating oils or lubricants containing finely divided infusible pigments such as clay, lime, mica or graphite. Most of such schemes were classified as "wet-film" lubricants which were wet and oily to the touch.

Later followed what is known as Singer's process, evolved in Germany and described in Singer United States Patent No. 2,105,015. Singer's scheme was to form a sponge-like coating, such as a phosphate, on the surface of the workpiece. The coating was not wet or flowable but was integral with the workpiece and could not be squeezed out in the drawing operation.

Phosphate coatings had been in use as early as 1914. These coatings had no lubricating value *per se*. They were, in fact, abrasive and caused tool and die wear even through superposed lubricants. The reason they were used in lubricating schemes was due to their ability to absorb and carry lubricant into a high pressure zone.

The next step forward in the art after the Singer process, was the development of the Gilron "Dry-Film" soap and borax lubricant. In this process, soap and borax were mixed with water and applied as an aqueous solution to the surface of the workpiece. The soap and borax coating was then dried by heat lamps or the like onto the surface of the workpiece.

As drawn, it was a hard fixed film and stayed with the workpiece in the high pressure zones. No other lubricant was used.

The Gilron soap-borax coating on bare metal being transparent, permitted inspection of the workpiece and eliminated the abrasive phosphate. The Gilron process supplanted the Singer process in the shell case program of the United States Government during World War II.

In 1942 and thereafter until 1945, Henricks, the patentee of the patent in suit, was employed by Gilron Products Company and was familiar with the uses of soap-borax lubricants described in patents No. 2,469,473 and 2,530,837. The Gilron lubricating product for use in drawing steel was sold under the tradename "Drawcote" and was composed principally of sodium soap formed from tallow and palm oil, and of borax in proportion by weight of 10-33% soap to 67-90% borax.

Drawcote was sold in the form of a dry powder. Gilron Products Company obtained patents on Drawcote and its use. United States Patents No. 2,469,473 dated May 10, 1949, and No. 2,530,837 dated November 29, 1950, were obtained upon the joint application of Gilbert H. Orozco, a partner of Gilron Products Company and his employee Henricks, the patentee of the patent in suit.

Drawcote was extensively sold and used in 1942 and 1943 in cold drawing of steel cartridge cases. In those years during World War II, there was a shortage of copper for making brass shell cases for the ammunition used in military and small arms weapons. The Government required manufacturers of shell cases to make them from steel by cold drawing and deforming. This manufacture of steel shell cases occurred largely during the period 1942–1944, after which copper again became available.

In the manufacture of shell cases, Gilron's Drawcote was able to replace the use of other lubricants such as lubricated copper coatings for steel and lubricated phosphate coatings for steel.

In 1943, among those using a lubricated phosphate coating on steel in the operation of cold drawing steel 75 mm. shell cases, was Briggs Manufacturing Company, Detroit. That Company was then providing zinc phosphate coatings on steel blanks and applying thereover a sulphurized grease as a lubricant. About June 1943, Whitbeck of Gilron Products Company sold Drawcote to Briggs. By experimentation, Briggs found it could successfully carry out its cold drawing operation with the Drawcote soap-borax lubricant applied directly to the surface of the steel without the phosphate coating.

Plaintiffs admit the Gilron borax coating solved many drawing problems existing at that time and that even today, it is satisfactory for many draws. However, plaintiffs claim the process has its limitations and cannot do what the Henricks process does.

The Patent Office was fully advised of the nature and advantages of the Gilron process. Patent No. 2,469,473 was a file wrapper reference.

Several references are made in the briefs to the "German Process." This was developed prior to 1942. In this process, a phosphated workpiece is soaked as long as fifteen hours in an aqueous soap solution to form thereon by chemical interaction between the phosphate and soap, a water-insoluble soap film. A serious defect in this scheme was that the residual deposit was not water soluble and presented a difficult cleaning problem especially if the workpiece was to be electroplated.

Plaintiffs concede all of the elements which Henricks employed in Claim 4 in the patent in suit were old *per se* or in other combinations and have been available in the art for some years. However, plaintiffs contend that the elements which Henricks selected were put together in a new way and achieved a new and unexpected result.

Plaintiffs claim that in the specific embodiment of Claim 4, the "phosphate coating" is the abrasive coating of the Sing-

er process—a seeming retrogression in the art. The overlying film is a fixed one and the "solid meltable organic" constituent thereof is soap, the use of which had previously been found undesirable because of the cleaning problem. The "solid meltable inorganic compound" distributed therethrough, meltable at a temperature below the melting point of the abrasive phosphate coating and having a hardness not more than 5 on the Mohs' scale, is borax.

Plaintiffs argue that new and unexpected results flow from the conjunction of elements defined in the drawing process of the Henricks' patent; that tool and die life is greatly increased and severe drawing operations can now be performed which were previously impossible. Plaintiffs say there is a coaction during the high temperatures and pressures whereby the abrasive phosphate coating reacts with the borax to form amorphous glassy materials which contribute significantly to the lubricating value of the coating; that the formation of insoluble organic materials is inhibited and there is no cleaning problem.

There is substantial evidence in the record to prove that a new coaction between the soap, borax and phosphate occurred during the drawing process. Friedberg's tests showed that in the Henricks' process, new compounds are formed; the formation of insoluble organic compounds is inhibited, and the abrasive phosphate is transformed into a glassy amorphous compound having highly effective lubricating properties.

There was also proof based upon commercial use and experience. Metal Forming & Coining Corporation tried a number of the prior art schemes including oils, waxes and drawing compounds, but the testimony showed that the only process that enabled this Company to cold form or coin small parts commercially is the combination in the Henricks' patent in suit. Testimony showed tool and die life was increased one thousand fold so that for given tools, three or four hundred thousand pieces were run where previously only three or four hundred pieces could be run. The Henricks' process made it possible to manufacture articles of superior quality at a much lower cost, the advantage being so marked in some cases as to spell the difference between success and failure on heavy reductions and difficult extrusions.

Defendants have engendered a great interest in an endeavor to have the Henricks' patent in suit declared invalid. The defense of this action has been conducted primarily by the attorneys for the Parker Rust Proof Company of Detroit. Parker supplies phosphate and lubricating materials to defendant General Motors, and is holding General Motors harmless. Parker solicited financial and legal help in this lawsuit from a number of its own competitors, and at least three of these competitors in manufacturing and selling phosphate and lubricating material, have given assistance in this case. Of course, these competitors had the right to give such assistance. However, such interest does indicate that the process covered in Claim 4 of the patent in suit is something of special value and merit and of great importance to those working in the field of cold drawing and deforming operations.

The trial court held Claim 4 too broad and lacking in specificity. The court stated the claim did not specify the kind of phosphate coating, the kind of organic binding, the kind of solid inorganic compound, as well as not specifying the amounts and relative proportions of any such items.

Pertinent on this point is a recent case before this Court, Binks Manufacturing Company v. Ransburg Electro-Coating Corporation, 281 F.2d 252. In that case, the claim was made that the method claims of the patent there in suit did not satisfy the requirements of the patent statute (35 U.S.C. § 112) due to failure to specify voltage, spacing and liquids to which they are applicable. In overruling this argument we said at page 256 of 281 F.2d: "The process claims define the specific steps of procedure and the speci-

fications being addressed to those skilled in the art * * * need not recite details." We further stated at page 257 of 281 F.2d: "There is no requirement that quantitative values for such factors as voltage, spacing and liquid characteristics be recited. The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to particular material or to obtain the particular results desired does not impair validity of the patent."

■ The fact that Claim 4 distinguishes from thirty-one references in a mature art, none of which anticipate, quite clearly establishes that the claim is not too broad and indefinite.

■ Patent claims should be generic in character and do not necessarily have to be specific. It is entirely proper to refer in Claim 4 to "a phosphate coating" without specifying which "phosphate coating."

The examples stated in the patent in suit and the specification teach the use of soap and borax over phosphate. They give formulas for the soap and borax and they identify the phosphate coating baths so that one skilled in the art could make them. The trial court was in error in holding that Claim 4 in the patent in suit was too broad and lacking in specificity.

■ It is fundamental that a patent is presumed to be valid and the burden of establishing invalidity rests on the party asserting it (35 U.S.C. § 282). It is well established the presumption of validity is not overcome except by clear and cogent evidence. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163; Hazeltine Research, Inc. v. Dage Electric Company, Inc., 7 Cir., 271 F.2d 218, 224.

Defendants claim the Patent Office did not consider Singer Patent No. 2,105,015 nor British Patent No. 494,830 of 1938, and also several publications. However, the Singer process is described in British Patent No. 496,866 which was relied upon by the Patent Office during prosecution of the patent. Soap and borax dry-film lubricants are described in Patents No. 2,-469,473 and 2,470,062. The former was relied upon as a reference in the Patent Office and the latter is referred to in the body of the specification of the Henricks' patent in suit.

The Patent Examiner had before him as prior art, all of the elements of Henricks' combination and found patentable invention in the combining of these elements. In fact, the Patent Office twice found invention over the prior art, first, when the original patent was granted, and second, when the reissue patent was granted. There is no showing in this case that the most pertinent prior art was not considered by the Patent Office. On the contrary, we think the most pertinent art was cited and was found insufficient to negative patentability.

We cannot sustain the conclusion of law of the trial court that Henricks merely adopted the process which, in view of the prior art, was obvious to persons skilled in the art. The history of Parker Rust Proof Company demonstrates the process was not obvious. Parker Rust Proof has been a self-proclaimed leader in this field since 1914, but Parker remained uncertain as to how the problem should be solved until some considerable time after the Henricks' invention date.

Dr. Gibson was Technical Director for Parker in 1949 when they decided to develop a lubrication system. Dr. Gibson is now a professor of chemistry and qualified as one "skilled in the art." Parker, in 1949, was operating in the light of the prior art. Dr. Gibson was in charge of this development. They started in "basically with a literature search." They then worked with wet-film lubricants because, as Dr. Gibson testified, "We hadn't realized the true value of drying that particular film." Parker experimented with the formation of an organic film with phosphate as mentioned in the German references. Finally, Parker came to the Henricks' combination which it extolled in its literature as a new development of Parker.

The literature references which Parker now points to as teaching the invention, taught Parker nothing. Neither did the practices at Briggs Manufacturing Company. The substitution of soap and borax dry-film for the wet lubricant in the Singer process was, in fact, not obvious to Parker.

The Henricks' process was not, in fact, obvious to the defendants and the others now associated with them in the defense of this suit. None of them made the substitution of elements in the Singer process which, by hindsight, now appears to them to have been "obvious."

Although the learned trial judge found Claim 4 of the patent in suit to be invalid on all suggested grounds, we are of the view that the closest question in the case is the finding and conclusion of the trial court as to public use. This, in turn, refers to use at Briggs Manufacturing Company in 1943. All of the evidence on this point, except patentee's own evidence, is contained in depositions. It is apparent from Finding 14 that the Court relied upon the testimony of Tousley and Brown which appeared in depositions.

■ As the evidence relied on appears in depositions, we are in as good a position as the trial court to examine it and determine for ourselves whether the use at Briggs Manufacturing Company was a public use. Kiwi Coders Corporation v. Acro Tool & Die Works, 7 Cir., 250 F.2d 562, 568; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857.

The trial court did not hold the combination claimed in the patent in suit was publicly used in its entirety or that the valuable new result flowing from the combination was understood or achieved at Briggs. What the trial court decided was: "While it is arguable that the precise combination and coaction indicated by the patent are not found verbatim in the prior art, one armed with the knowledge of a worker skilled in that field could, the Court believes, have achieved the result covered by Claim 4 of the reissue patent." The trial court further

recognized that the patentee in the patent in suit did make a stride forward in the art but apparently thought it was not sufficient to merit a patent monopoly.

■ There exists a well established rule that to invalidate a patent on the ground of public use, the prior public use must be established by clear and convincing proof.

In Smith v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 718, 81 L.Ed. 1049, the Court refers to the rule as " * * * the heavy burden of persuasion which rests upon one who seeks to negative novelty in a patent by showing prior use." In Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 931, 79 L.Ed. 163, the Court cites with approval a number of cases for the proposition, the burden of proof is upon the party setting it up and "every reasonable doubt should be resolved against him." Indeed, the late Chief Judge Learned Hand stated the rule in even more emphatic language in Block v. Nathan Anklet Support Co., Inc., 2 Cir., 9 F.2d 311, 313, " * * * but in such cases probability, even extreme probability, is not enough. The proof must be as absolute as in a criminal conviction; indeed, the rule comes nearly to this, that one must have contemporaneous records, verbal or structural."

In June 1943, when Henricks came to the Briggs Manufacturing Company in behalf of the Gilron Products Drawcote, a number of experiments were conducted which led to the changeover from the Singer process to Gilron. Each blank tested was subjected to six consecutive forming operations. Henricks experimentally ran two baskets of blanks with a phosphate undercoat. There were approximately one hundred test pieces in the two baskets, a very small amount considering the large volume being handled. No further notice was taken of the pieces themselves, and they were enveloped in the big flow of material that was in process. The success of the process was in no way there demonstrated. This rather minor incident at Briggs did not lead

to the use of the patented combination by Briggs. In fact, Briggs abandoned the use of phosphate entirely. The temporary and almost casual experiment with soap and borax went into the discard.

After the decision in this case by the trial court, Henricks received information that the United States Government Arsenal at Joliet, might have a report which would show the true facts as to the Briggs operation. Inquiry there revealed nothing. The inquiry was forwarded to Frankfort Arsenal. Nothing was found there, but when the inquiry was forwarded to the Record Files in Missouri, a report was located. Henricks was permitted to read the report and make extracts therefrom.

Plaintiffs filed a motion to amend the findings of fact and for a new trial. The Court denied the motion. This was understandable where the Court considered the patent to be invalid on all grounds urged. However, as our view is that the turning point of this case is the question of alleged public use at Briggs, we think the report should have been considered, especially that part which deals with the initial experimentation with the Gilron process. It would appear reasonable that if there had been any significant or more than experimental use of soap and borax over phosphate in cartridge-case manufacture at Briggs, it would surely have appeared in the report which the Briggs officials made to the army ordnance.

Another convincing argument in favor of plaintiffs' contention is that if soap and borax had been applied over phosphate in regular production, there would necessarily have been a tank for phosphate solution and a separate tank for the soap and borax solution arranged in series so that the baskets containing the blanks or workpieces would move successively through the two solutions. There is no claim that any such procedure was followed.

We hold there is no sufficient showing of prior public use and that Claim 4 of the patent in suit is valid. The case will, therefore, be remanded to the District Court for further proceedings consistent with this opinion, as the question of validity only was passed upon in the previous trial.

Reversed.