**DEVEX CORPORATION et al.,**
**Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION,**
**Defendant.**

**Civ. A. No. 3058.**

United States District Court.
D. Delaware.

Sept. 8, 1970.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., Walter J. Blenko, Frederick B. Ziesenheim, and Arland T. Stein, of Blenko, Leonard & Buell, Pittsburgh, Pa., of counsel, for plaintiffs.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., George N. Hibben, of Hibben, Noyes & Bicknell, Chicago, Ill., Neal A. Waldrop, of Harness, Dickey & Pierce, Detroit, Mich., and William S. Pettigrew, Detroit, Mich., of General Motors Corp., of counsel, for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action for infringement of Claim Four of Reissue Patent No. 24,017. It has been tried on the merits without a jury and the Court has heard posttrial argument.

## DISCUSSION

Claim Four is now the creature of judicial construction. Its validity was saved by a narrow reading in the Court of Appeals for the Seventh Circuit, Devex v. General Motors, 321 F.2d 234 (7th Cir. 1963), applied here as the law of the case, Devex v. General Motors, 263 F. Supp. 17, 23–24 (D.Del.1967).[1] It is not the law, and the premise has not been seriously advanced, that proof of literal infringement would entitle plaintiffs to a judgment.

In reversing the lower court decision that the process was unpatentable because obvious from the prior art, the Court of Appeals relied on evidence that "new and unexpected results flow from the conjunction of the elements defined in the drawing process * * *." 321 F.2d at 237. The new and unexpected results are not found in the language of the claim, but they are now its essence. Similar processes with different results do not infringe. This Court said in an earlier opinion, "If an allegedly infringing process falls within the literal language of the claim, but can be shown to operate in a different manner from the patented process, then there is no infringement." Devex v. General Motors, 263 F.Supp. 17, 25, 26 (D.Del. 1967).[2] Plaintiffs were obliged, therefore, to show by a preponderance of the evidence, that the accused processes duplicated the critical results.

As in many patent cases, the Court found itself confronted with a mass of technical data and analysis. The evidence consisted largely of tests prepared by experts for each side in preparation for litigation. The test results and expert conclusions are conflicting, as might be expected, and, even to a layman, it appears that objectivity, the unremitting master of every laboratory, has not always been a fixed star in the inquiries conducted and presented to the Court. Although the errors, mostly of omission, seem to have occurred from diligence in the pursuit of proof rather

1. See also Devex v. Houdaille Industries, 382 F.2d 17, 22–23 (7th Cir. 1967).

2. In Devex v. Houdaille Industries, 382 F. 2d 17, 22–23 (7th Cir. 1967), plaintiffs contended that the claim should be applied literally to the accused process. The court said in response, "Such a construction would monopolize the whole broad field of metal forming with any use of a dry soap and borax over phosphate at any temperature or pressure, regardless of the results."

than from bad faith or fraud, their presence has compounded the burden of one unskilled in the technology attempting to reach a correct result.

■■ Because the issues are vigorously disputed by learned men of science, the outcome depending entirely on which tests, analyses, and explanations the Court adopts, it is well to recall, as did Judge Kirkpatrick, "that we are engaged in the determination of a dispute between two parties in a court of law, rather than in an excursion into the realm of scientific research, and we must approach the question from the standpoint of the rules which the law has established for resolving the controverted issue." Shimadzu v. Electric Storage Battery Co., 17 F.Supp. 42, 52 (E.D.Pa.1936). In making findings of fact, the Court is not conducting laboratory analyses, but applying a legal judgment to the evidence before it. It is making a determination that facts are proved or not proved, that the party who has the burden on a given issue has sustained it or not. A finding against the party with the burden, as the Court makes here, does not require absolute conviction that the opposing party has proved a contrary case. Any other approach would require judges to know more about the technology of a patent than the experts whose disagreement brings the dispute to court.

Plaintiffs were obliged to prove that a coaction occurs in the accused processes among the soap, borax and phosphate at high temperatures and pressures, causing new compounds, including but not limited to glassy amorphous compounds, to be formed, and inhibiting the formation of water insoluble compounds. These results were demonstrated by plaintiffs' witness Henry Friedberg and relied on by the Court of Appeals to sustain the claim's validity. 321 F.2d at 234. This Court heard nineteen days of live testimony, which comprised most of the expert opinion relied on by the parties. It has reviewed the evidence and the exhibits offered to it and to the courts which considered validity, and it concludes that plaintiffs have not met their burden in establishing the essential results. The Court has no doubt that defendant's processes are effective, beneficial and an improvement over earlier solutions to their lubricating problems, nor that they utilize some of the learning upon which the patent is based. Use of that learning is not actionable, however, unless it produces the critical results.[3]

## THE NEW COMPOUNDS

Plaintiffs' expert Henry Friedberg was again a key witness at the infringement trial. Plaintiffs relied almost solely on his tests and analyses to show that the new compounds are formed in the accused process. The Court was not comfortable, however, with Friedberg's reliance on his earlier experience with tests on the patented process to justify shortcuts in analysis of the accused ones. He failed to repeat his tests on the accused processes, to develop any standard charts, and to make any tests on the accused process without borax; he was quick to accept minimal evidence to identify the purported new compounds. His conviction was no substitute for the doubts implanted by probing crossexamination, and the Court was unpersuaded that the coaction occurred and new compounds formed even before defendant began its case.

The testimony of Dr. Martin Buerger concluded the issue. Dr. Buerger was a convincing witness, confident in his methods and his conclusions yet honest in their limitations. He found no evidence of the new compounds identified by Friedberg, and plaintiffs did little to shake the strength of his testimony. His conclusions were in accord with the findings of defendant's other expert, Dr. Cheever, and although Dr. Cheever lacked the confident demeanor and commitment to objectivity displayed by Dr. Buerger, that they should agree on this point is

---

3. Varying the proportion of borax for the heavier draws with Bonderlube 246, for example, is taught by the prior art Whitbeck patent.

significant, and it strengthens the finding that defendant's evidence was on the whole more convincing.

## AMORPHOUS COMPOUNDS

Plaintiffs relied on the results of Friedberg's X-ray charts to establish the existence of the glassy amorphous compounds supposedly produced by the coaction. It is undisputed however, that in most cases such compounds are not discoverable, much less identifiable by X-ray analysis. Friedberg admitted that the basis for his conclusion, the flattening out of the tracings, could be due to the wiping action of the deformation process. The Court could not conclude that the amorphous compounds were present when the only evidence was a test not designed to disclose them.

## WATER INSOLUBLE COMPOUNDS

The debate centered around zinc stearate, since it was that substance which was created by the prior art German process and the inhibition of which Henricks, the patentee, specifically claimed as an advance. On this issue again, there was no reason to disbelieve Friedberg's statement that he found no zinc stearate, but his failure to identify, or even to search extensively for, the peaks at the low angles was unsettling. When defendant's explanation that the low angle peaks actually represent a type of basic zinc stearate, admittedly not recorded in the ASTM files but chemically logical nevertheless, was presented, the Court found itself in a quandary.

Although Friedberg discovered upon reexamination that the mysterious peaks corresponded to those for barium stearate given in the ASTM files, plaintiffs did not present a chemical analysis of the substance either as produced by defendant or as found in residue after boiling a workpiece. The innuendoes that defendant had created a new substance and was being less than honest about its composition were not supported by proof, and the Court would not prefer them to evidence when no reason to doubt credibility or to suspect fraud appeared. Defendant had at least a standoff, and the plaintiffs, having the burden on the issue, must suffer the facts to be found against them.

Having found these three groups of facts, as well as others not discussed herein, against the plaintiffs, the Court must enter a judgment for defendant, and will do so upon submission of a proper order.

The foregoing and the findings of fact and conclusions of law which follow are made in compliance with Rule 52(a), Fed.R.Civ.P., 28 U.S.C.

## FINDINGS OF FACT

1. The plaintiffs herein are as follows:

Devex corporation, an Ohio corporation located at Lakewood, Ohio;

Technograph, a North Carolina corporation having its principal place of business at 920 Northwest Boulevard, Winston-Salem, North Carolina;

William C. McCoy, now deceased, a citizen of the State of Ohio residing at 2712 Claythorne Road, Shaker Heights, Ohio;

Theodore A. TeGrotenhuis, a citizen of the State of Ohio residing at 7315 Columbia Road, Olmsted Falls, Ohio;

Frederick B. Ziesenheim, a citizen of the Commonwealth of Pennsylvania residing at 355 Woodside Road, Pittsburgh, Pennsylvania, and one of the attorneys of record for plaintiffs in this action;

Marjorie E. TeGrotenhuis, a citizen of the State of Ohio residing at 7315 Columbia Road, Olmsted Falls, Ohio;

William C. McCoy, Jr., a citizen of the State of Ohio residing at Shaker Boulevard, R. D. #3, Chagrin Falls, Ohio;

Katherine M. Bassett, a citizen of the State of Connecticut residing at 27 Ox Ridge Lane, Darien, Connecticut.

2. Defendant General Motors Corporation, is a Delaware corporation residing in the District of Delaware.

3. The patent in suit is the outcome of an application, Serial No. 665,905, filed April 29, 1946, by the patentee Henricks. This application was abandoned in favor of a continuation-in-part application filed October 31, 1950, which issued as United States Patent No. 2,588,234, dated March 4, 1952. Application for reissue of Patent No. 2,588,234 was filed March 1, 1954 and on June 7, 1955, issued as Patent No. Reissue 24,017 now in suit. PTO [4] 2.

4. Plaintiff Technograph holds all rights in and to Henricks Patent Re. 24,017 save for bare legal title which remains in the individual named plaintiffs. Plaintiff Devex has remained party to this action by virtue of certain reversionary rights. PTO 1, 2.

5. Only Claim 4 of the Henricks Patent No. Re. 24,017 is charged to be infringed by defendant in this action. That claim is as follows:

The process of working ferrous metal which comprises forming on the surface of the metal a phosphate coating and superimposing thereon a fixed film of a composition comprising a solid meltable organic binding material containing distributed therethrough a solid inorganic compound meltable at a temperature below the melting point of the ferrous metal phosphate of said coating and having a hardness not exceeding 5 on the Mohs' hardness scale, and thereafter deforming the metal.

6. This patent infringement action was originally filed on November 13, 1956, in the United States District Court for the Northern District of Illinois under Civil Action No. 56–C–1912. A similar action was filed against Houdaille Industries in the same Court on May 22, 1957, under Civil Action No. 57–C–892. These Civil Actions Nos. 56–C–1912 and 57–C–892 were consolidated for trial on the issue of validity of Claim 4 of the Henricks Patent No. Re. 24,017. After trial, Judge Edwin A. Robson held Claim 4 of Henricks Patent No. Re. 24,017 invalid. On appeal, the Court of Appeals of the Seventh Circuit reversed and held Claim 4 valid, 321 F.2d 234. After remand, and on plaintiffs' motion, the case as to General Motors was transferred to the District of Delaware on July 16, 1965. The issues are raised in the Amended Complaint filed July 17, 1968 and in the Answer to the Amended Complaint filed August 19, 1968.

7. On January 16, 1967, this Court, by an opinion reported at 263 F.Supp. 17, denied plaintiffs' motion for summary judgment on the infringement issue.

8. Plaintiffs charge that the following metal forming processes of defendant infringed Claim 4 of the Henricks patent as held valid by the Court of Appeals of the Seventh Circuit. PTO 3–19.

A. *Pontiac Bumper Forming Process*
PTO 3–10

(1) During 1955 and 1956 prior to commencement of this action, defendant at its Pontiac Motor Division plant formed automobile bumpers in progressive dies after Spra-Bonderite 111X had been applied to form a phosphate coating and after Bonderlube 246 had been applied in a dilute solution to the phosphate coating and dried. PTO 3.

(2) Spra-Bonderite 111X was an acid zinc phosphate solution containing 12.0% Zn, 9.3% $NO_3$, 29.2% $PO_4$ and the balance water. The Bonderlube 246 in its dry state contained 15% borax and the balance sodium stearate-sodium palmitate soap. PTO 3.

(3) After flat steel blanks had been polished on one side to the finish desired on the bumper part prior to electroplating, and after the polished blanks had been spray cleaned in a Parco No. 341 cleaning solution and rinsed in hot water, Spra-Bonderite 111X phosphating solution was sprayed onto the blanks at a temperature of about 140° F to 150° F for 50 seconds. The phosphating step was then followed by cold and hot water spray rinses. PTO 4–5.

4. Refers to Pre-Trial Order and page number.

(4) The phosphate coated blanks were then rinsed in a hot solution of Parcolene 21 and water, and the excess solution thereafter removed from the surface with rubber squeegee rolls. Parcolene 21 in its dry state is 90% borax and 10% sodium nitrite and the Parcolene solution is made by mixing 2 pounds of Parcolene 21 with 100 gallons of water, Parker Specification No. 96, PX 60. PTO 5.

(5) A solution of Bonderlube 246 in water was then roller coated onto the phosphate coated blank at a temperature of approximately 190° F. The Bonderlube solution was prepared for coating and replenished during coating in accordance with the Parker Rust Proof Specification No. 113, PX 61, wherein 100 pounds of Bonderlube 246 were mixed with 100 gallons of water. PTO 5.

(6) The coated blanks were then passed through an infrared drying oven maintained at an interior air temperature of 425° F for a period of 20 seconds to remove the water and form a dry film on the blank. This completed the coating operation in preparation for cold forming the bumper parts. PTO 5.

(7) The bumper parts comprised the front bumper lower impact bar (Part No. 521374), the front bumper bomb guards (Part Nos. 521424–5, Assembly Part Nos. 521794–5), the front bumper impact bars (Part Nos. 521338–9, Assembly Part Nos. 521771–2), and the rear bumper cross bar (Part No. 518851, Assembly Part No. 518963). The blanks which had been previously subjected to the above-stated lubricating steps, were then formed into the final bumper configuration and also cut, trimmed and pierced in a continuous operation by a series of dies in separate presses. PTO 5–8.

(8) The metal used for the flat steel blanks was a low carbon steel SAE 1008 and 1010 having a thickness of .110 to .097 inch. PTO 9.

(9) After being formed, the bumper parts were cleaned and prepared for electroplating as follows:

(a) The bumper parts were first passed through a three stage washer in which Wyandotte cleaner called Ferlon (an alkaline solution) was sprayed on at a temperature of approximately 180° F. PTO 9.

(b) After drying, the bumper parts were inspected and hand polished, when necessary, to remove spot defects and burrs. PTO 9.

(c) Then the bumper parts were put through a power washer in which they were sprayed with Wyandotte No. 38 alkaline cleaner at approximately 180° F for about 3 to 3½ minutes. PTO 9.

(d) The bumper parts were then rinsed in hot water for about one minute. PTO 9.

(e) The bumper parts were then immersed for approximately 4 minutes in a McDermid cleaner at a temperature of 180° F. The McDermid cleaner included sodium hydroxide, trisodium phosphate and sodium carbonate. PTO 9.

(f) The bumper parts were then rinsed in cold water for approximately ½ minute, placed in an acid dip of 10% sulphuric acid by volume for ½ minute, and then rinsed in cold water. PTO 9.

(g) After cleaning, the bumper parts were inspected for defects and, when necessary, spot polished by hand. PTO 10.

(10) The cleaning steps and cleaning materials and solutions used in cleaning the surfaces of the bumper parts after drawing and prior to electroplating, as above described in subparagraphs (a) to (f) of paragraph (9), were the same as those used in Pontiac's prior bumper forming process wherein a lubricant Mar-Proof, described as a "sticky oil" or a "sticky gunk," was applied prior to forming. The cleaning steps gave the same results in the BL 246 process as in the prior Mar-Proof process. PTO 10.

B. *Valve Lifter Plunger Process* PTO 10–15

(1) Defendant commercially cold formed in an extrusion operation hydraulic valve lifter plungers from ferrous metal slugs during 1955 and 1956 at its Diesel Equipment Division prior to commencement of this action. Prior to extrusion, Bonderite 181X was applied to form a phosphate coating on the slugs and then Bonderlube 235 was applied in a dilute solution to the phosphate coating and dried. PTO 10–11.

(2) Bonderite 181X was an acid zinc phosphate solution containing 13.6% Zn, 18.3% $NO_3$, 15.7% $PO_4$ and the balance water. The Bonderlube 235 in its dry state contained 3% borax, 2% sodium nitrite, and the balance sodium stearate soap. PTO 11.

(3) After the slugs, which were of SAE 1012 low carbon steel, had been washed, grit blasted and annealed to secure a hardness of approximately RB 50 and a tensile strength of 35,000 to 50,000 p. s. i., and after they had been dipped in a pickling bath and rinsed in hot water, they were immersed for a period of 5 minutes in a Bonderite 181X phosphating solution which was maintained at a temperature of approximately 185° to 190° F, thus forming on and integral with the surface a phosphate coating. PTO 11–12.

(4) The phosphate coated slugs, after a cold water rinse, were then immersed for one minute in a solution of Parcolene 21 and water at room temperature. PTO 12.

(5) The phosphate coated slugs were thereafter immersed for a period of approximately 5 to 7 minutes in a solution of Bonderlube 235 and water maintained at a temperature of approximately 165° F. The Bonderlube 235 solution was prepared for coating and replenished during coating in accordance with the Parker Rust Proof Specification No. 96, PX 60, wherein 56 pounds of Bonderlube 235 were mixed with 100 gallons of water. PTO 13.

(6) The slugs were then dried to remove the water and form a dry film on the slugs. PTO 13.

(7) The slugs which had been previously subjected to the above-stated lubricating steps, were fed (2 slugs at a time) into a Verson circular dial feed press. The press had 12 stations, PX 81. With each stroke, it simultaneously loaded two slugs, sized two slugs to a cylindrical shape having a length of approximately 0.640 of an inch and a diameter of approximately 0.625 of an inch, extruded two slugs, pierced two slugs, coined two slugs and unloaded two slugs. The press production rate was 30 strokes (60 plungers) per minute. Upon unloading, the extruded plungers were approximately 1.180 inches long and 0.635 of an inch in diameter. PTO 13–14.

(8) After the press operations, the plungers were then cleaned in a single stage Detrex Rotary Drum washer, rotating on its horizontal axis, with advancing flights on the inner peripheral surface of the drum. As the formed plungers tumbled and advanced through the washer, Parco 532 cleaner (a mild acid type solution) was sprayed on them at a temperature of approximately 165° to 170° F, the spray solution forming a pool at the bottom of the washer. The parts were in contact with the cleaning solution for about 2 to 3 minutes. PTO 14.

(9) Prior to introduction of the above-designated procedures, the valve lifter plungers were machined from solid bar stock. PTO 14.

C. *Pontiac Rocket Forming Process* PTO 15–19

(1) Defendant cold formed in an extrusion process from metal billets rocket heads and rocket motor bodies for the United States Government at its Pontiac Motor Division plant during 1952 and 1953 after issuance of patent No. 2,588,234 on March 4, 1952. Prior to extrusion, Bonderite 180X was applied to form a phosphate coating and then Bonderlube 235 was applied in a dilute

solution to the phosphate coating and dried. PTO 15.

(2) The steps generally followed in the production of the rocket head at Pontiac are recited in PX 87 and PX 88 and are pictorially shown in the photograph on page 1 of PX 91. PTO 15.

(3) After the metal billets had been cleaned, they were immersed for a period of approximately five minutes in a Bonderite 180X phosphating solution which was maintained at a temperature between 180° and 200° F, thus forming on and integral with the surface of the ferrous metal a phosphate coating. Bonderite 180X was an acid zinc phosphate solution and was prepared for coating in accordance with the Pontiac Process Specification, PX 88. PTO 15, 17–18.

(4) After a cold water spray rinse, the phosphate coated billets were sprayed with a solution of Parcolene No. 20 and water at a temperature between 160° and 180° F for ½ a minute. Parcolene No. 20 in its dry state is 66.6% borax and 33.4% sodium nitrite. The Parcolene No. 20 solution was prepared for coating in accordance with Pontiac Process Specification, PX 88. PTO 18.

(5) The phosphate coated billets were thereafter immersed for a period of 5 minutes in a solution of Bonderlube 235 and water maintained at a temperature between 180° and 200° F. The Bonderlube 235 solution was prepared for coating in accordance with the Pontiac Process Specification, PX 88. The billets were thereafter dried to remove the water and form a dry film on their surfaces. PTO 18–19.

(6) The process followed in defendant's production of rocket motor bodies is set forth to some extent in PX 89. It has been agreed by and between the parties that with regard to infringement, the findings of this Court with regard to the rocket head process shall be controlling and conclusive as to the rocket motor bodies. PTO 19.

9. Plaintiffs offered evidence to prove that the accused processes not only embodied the process steps set forth in Claim 4, but also achieved the same new and unexpected results upon which the Court of Appeals relied to sustain validity. Devex v. General Motors, 321 F.2d 234 (7th Cir. 1963). Plaintiffs attempted to show, inter alia, that,

(a) there was a new coaction among the soap, borax and zinc phosphate at high temperatures and pressures resulting in the formation of the new compounds referred to by the Court of Appeals, 321 F.2d at 237;

(b) there was a new coaction between the borax and phosphate under high temperatures and pressures resulting in the formation of glassy amorphous compounds, 321 F.2d at 237;

(c) the formation of water insoluble compounds was inhibited and there was no cleaning problem, 321 F.2d at 237;

(d) tool and die life was greatly increased, 321 F.2d at 237;

(e) the use of soap-borax over phosphate spelled the difference between success and failure, 321 F.2d at 237;

(f) there was ferrous metal phosphate in the coatings as required by the claim.

Plaintiffs contended that the claim did not require the inorganic compounds (borax and sodium nitrite) to melt and offered evidence to show that they were *meltable* at a temperature below that of the phosphate. Defendant asserted that melting is required and relied on some of the plaintiffs' evidence and some adduced from its own witnesses to show that the compounds did not and could not melt during its processes.

10. The plaintiffs have failed to prove by a preponderance of the evidence that new compounds are formed in the defendant's accused processes by a coaction among the soap, borax and the phosphate coating on the work pieces.

(a) The plaintiffs submitted in evidence diffractometer charts PX 71 to PX 74 inclusive made by its X-ray diffraction witness Henry Friedberg, to establish the formation of new com-

pounds. Friedberg testified (a) he did not repeat his X-ray diffraction tests, Tr. 539–40, to determine whether the peaks he identified as including new compounds were actual diffraction peaks representing new compounds or random background irregularities; (b) he prepared no X-ray diffraction charts of the accused coatings without borax so as to determine whether the peaks relied upon in the charts PX 71–74 resulted from the presence of borax, Tr. 440–440A; (c) he made no standard charts of the new compounds he claims to have found so as to support his identifications, Tr. 578–79.

(b) At least three peaks of a diffraction pattern of a compound should be found for reliable identification of a compound. Tr. 498–99, 1173–75, 1459. Friedberg was unable to point to more than one or two peaks of any ASTM listing in the X-ray diffraction spectra on any one of the charts PX 71 through PX 74 as identifying new compounds allegedly formed in defendant's accused processes. Tr. 420–22, 425–27, 431–33, 434–36, 556–64; see testimony correction re PX 72 at 462.

(c) Friedberg selected 13 peaks in the spectra of the charts as identifying new compounds. A majority of these peaks occur at the same 2-theta angle locations as zinc phosphate peaks. Tr. 1450–58. Zinc phosphate constitutes a large portion of the coating of the accused processes, Tr. 1294, and a satisfactory identification of a new compound by a peak at the same 2-theta angle as zinc phosphates peak cannot be made. Tr. 505, 1450–57. Other of the peaks selected by Friedberg on charts PX 71, 72 and 74 as identifying new compounds appear to be of size and shape similar to the zig-zags of the spectra caused by background radiation. Tr. 1451–54, 1457–58; PX 69. A chart of Bonderlube 215 (no borax) over phosphate has peaks at the same 2-theta angles where boron compounds were identified by Friedberg in PX 71 and PX 72. Tr. 570–71, 573–74. The X-ray diffractometer charts PX 69 and PX 71 through 74 inclusive

and the testimony of the witnesses do not establish that new compounds are formed in defendant's accused processes by a coaction between the borax and the phosphate coating.

(d) Dr. G. D. Cheever, a chemist employed by defendant, testified that the patterns of peaks of the X-ray diffractometer charts of the accused BL 235 and BL 246 coatings do not reproduce and do not match the patterns of peaks of the standard zinc borate and boron phosphate X-ray diffractometer charts and patterns of peaks of ASTM sodium boron phosphate and all other possible boron compounds. Tr. 1353–72, 1402–14, 1459–61. No new compounds are formed in the accused processes before or during the drawing operations by any coaction between the borax and the phosphate.

(e) Defendant's witness Abram Davis, is an expert in infrared analytical techniques. Tr. 2083–85. The infrared patterns of his charts of the accused BL 235 coating, the TD–1286–Q coating (no borax) and the German process coating are substantially the same. Tr. 2088. There is no evidence in the BL 235 infrared chart indicating that new compounds are formed by any coaction between the borax and the phosphate. Tr. 2088.

(f) Dr. Martin J. Buerger testified as an expert in analyzing defendant's powder photographs of the accused processes. He is Professor Emeritus at Massachusetts Institute of Technology and Professor at the University of Connecticut. He has been engaged in the study of crystal structures and the use of X-ray diffraction for 38 to 40 years Tr. 1107–1123A, 1125; DX 361.

An advantage of an X-ray powder photograph over an X-ray diffractometer strip chart is that the bursts of radiation are integrated uniformly over the entire film and do not interfere with the resolution and intensity of the lines resulting from beams diffracted by compounds. Tr. 1657–58, 1166–68, 1170–71. The powder photograph method using the Guinier camera is an accepted method

and machine for analyzing materials by X-ray diffraction. DX 376A–C.

The photographs were taken of samples prepared, in accordance with established practice, by removing the coatings as a powder from the supporting surfaces and placing the powder particles in a holder through which the X-ray beams were directed. Tr. 1490–91, 1493–94; DX 250. The removal of a powder sample from its substrate is a standard way of preparing a sample for a powder photograph and such removal does not change the characteristic diffraction pattern as to the location of the lines. Tr. 1174–75, 1774; DX 250.

The patterns of lines of the powder photographs of the accused Bonderlube 235 and Bonderlube 246 coatings do not reproduce and do not match the patterns of lines of the standard zinc borate and boron phosphate powder photographs, or the patterns of lines of the gauge strips of other ASTM boron compounds and compounds identified by Friedberg as new compounds. Tr. 1679–94, 1717–22, 1729–35. Also, the pattern of lines of the powder photographs of the accused BL 235 and BL 246 coatings are substantially identical with the patterns of lines of the reference powder photographs of the BL 232 (soap without borax) and BL 248 (soap without borax). Tr. 1688, 1717–22, 1729. No new lines which would indicate the possible formation of new compounds due to the presence of borax appear in the BL 235 and BL 246 photographs as compared to the BL 232 and BL 248 reference photographs. Defendant's powder photographs of samples of the accused processes and of samples of soap without borax are persuasive that no new compounds are formed in the accused processes before or during the drawing operations by any coaction between the borax and the phosphate.

(g) The necessary conditions for starting and continuing reactions to form new boron compounds are not present in defendant's accused processes. Tr. 1480–83, 1645. Such reactions require high temperatures, above 600° C (1100° F), a reaction time of several hours at such high temperatures, and high concentrations in the solutions.

(1) In none of defendant's processes do the coatings become heated to temperatures in excess of 600° C (1100° F). Tr. 79, 1481.

(2) The heating of the coating in defendant's processes occurs in a second or a fraction thereof and not over the period of hours required for a reaction. Tr. 1481.

(3) Defendant's processes involve only dilute solutions of BL 235 and BL 246 which do not contain high concentrations of reacting ions which must move through a system and come in contact with other ions to form new compounds. Tr. 1481.

(h) There was testimony that zinc borate may be formed out of a cold concentrated borax solution by adding zinc sulphate or zinc chloride. Tr. 2590. However, defendant's solutions are dilute and do not contain zinc sulphate or zinc chloride. Tr. 2608; PTO 10, 18.

11. Plaintiffs have failed to establish by a preponderance of the evidence that glassy amorphous compounds are formed in the defendant's accused processes during the drawing operations.

(a) The evidence presented by plaintiffs analyzing samples of the coatings of the accused processes on the issue of whether glassy amorphous compounds are formed by any reaction of the borax and the phosphate coating were X-ray diffractometer charts PX 69 to PX 74, inclusive, and the testimony of plaintiffs' witness Friedberg with respect to those charts. Tr. 428, 523–531.

(b) Amorphous compounds are non-crystalline and are not detectable by X-ray diffraction methods, the only analytical method pursued by plaintiffs on the glassy amorphous compound issue. Tr. 523, 524, 528a, 529, 578.

(c) The reductions in the sizes of the peaks and the smoother appearances of the spectra in X-ray diffraction charts PX 72 (BL 246) and PX 74 (BL 235) of

samples after the drawing operation as compared to charts PX 71 (BL 246) and PX 73 (BL 235) of samples before the drawing operation do not establish that glassy amorphous compounds are formed by a reaction of the borax with the phosphate coatings. Tr. 527–28, 531, 1461–62. The pattern in X-ray chart PX 70 (BL 215, soap without borax, over phosphate after forming) is also smoother with lower peaks than the pattern of PX 69 (BL 215 over phosphate before forming). Tr. 575–78. The reduction in size of the peaks on PX 72 and PX 74 is not shown to have been caused by any action differing from that which occurred as to PX 70 and which must have been an action unrelated to the presence of borax.

(d) Defendant's X-ray diffraction expert Dr. Cheever testified that reduction in the peak heights and the smoothing down of the spectra in X-ray diffraction charts PX 70, 72 and 74 of drawn samples occurs because during the drawing operation the coating is spread over more surface area as the metal stretches and flows and some of the coating is wiped off by the dies, thereby leaving less material at any one area to diffract the X-ray beam. Tr. 1461–62. Plaintiffs' witness Friedberg conceded that this wiping action was possible and that peaks can disappear due to other reasons than the formation of amorphous compounds. Tr. 527–28, 531. There is no record evidence demonstrating that the reduction in size of the peaks on PX 72 and PX 74 is due to the action of the borax, rather than this wiping action.

(e) Plaintiffs' witness Friedberg was unable to identify by name or formula any particular glassy amorphous compound in the samples of the charts PX 72 and PX 74 which he contended had been formed. Tr. 524, 528–29, 576–78. He did not distinguish the glassy amorphous compounds he contended were shown by charts PX 72 and PX 74 from those he stated were shown in PX 70 (no borax). Tr. 575–78. Nor did he distinguish the glassy amorphous compounds which he contended were shown by charts PX 72

and PX 74 from the glassy amorphous compounds which the prior art Orozco-Henricks patent 2,469,473 (DX 1) discloses are formed by the use of a soap-borax lubricant over metal without phosphate during the drawing operation.

12. The plaintiffs have not established by a preponderance of the evidence that the formation of water insoluble organic compounds is inhibited by borax in the defendant's accused processes.

(a) Plaintiffs' X-ray diffractometer chart PX 74 shows that the borax does not inhibit the formation of water insoluble compounds in defendant's BL 235 process. Friedberg failed to recognize the presence of basic zinc stearate in his X-ray chart PX 74 of defendant's BL 235 process which is shown by a number of new high peaks formed at 2-theta angles 5.5, 8.2 to 8.4 and 11. Tr. 565–69, 1349–50. The peaks at those angles agree with the water insoluble basic zinc stearate peaks at the same positions in defendant's standard basic zinc stearate X-ray chart DX 313–II and their relative intensities are the same. Tr. 1349–50. Dr. Cheever identified the new high peaks in PX 74 as basic zinc stearate peaks. Tr. 1349–50.

(b) Plaintiffs did not make the test of boiling in water any samples of the accused processes to determine whether or not water insoluble organic compounds formed any part of the coatings thereof. Tr. 348–49, 586–87.

(c) The infrared patterns run by Davis of Hooker Chemical Corporation on samples of BL 235, TD–1286–Q (no borax) and the German process, all over zinc phosphate, showed a characteristic at the 1600 reciprocal centimeters band which was not in the infrared pattern of USP zinc stearate. Tr. 1900. Hooker's Miss Hartinger, a qualified analytical chemist, after a review of the literature, produced in May 1965 a basic form of water insoluble zinc stearate whose infrared pattern included a strong infrared band at 1600 and matched the patterns of the coatings of the BL 235, TD–1286–Q and the German process. Tr. 1906–08.

(d) A sample of Miss Hartinger's May, 1965 batch of water insoluble basic zinc stearate was used by Dr. Cheever in making his standard X-ray diffractometer charts, DX 313–I, II and III, and DX 317. Tr. 1908–09, 1336–37, 1398, 1566–67. A sample of basic zinc stearate from a second batch produced by Miss Hartinger in June, 1965 which also gave the same strong 1600 infrared band, Tr. 1912–13, was used as the water insoluble basic zinc stearate standard in making powder photograph MSU 5a (DX 256a). Tr. 1600.

(e) The Buerger powder photographs disclose that the pattern of lines of the water insoluble basic zinc stearate standard photograph (DX 256a) are matched by the patterns of lines in the BL 235 photographs (DX 260a, 257a) and by the pattern of lines in the BL 246 photograph (DX 261a) as well as by the patterns of lines in the BL 232 and BL 248 photographs (DX 262a, 264a) with no borax. Tr. 1671–77, 1723–24. The line patterns of basic zinc stearate in the photographs of samples of the accused BL 235 and BL 246 processes are the same as the line patterns of basic zinc stearate in the BL 232 and BL 248 photographs without borax. Tr. 1674–75, 1724. This matching of lines in the powder photographs indicates that water insoluble basic zinc stearate is formed in the coatings of the accused processes and that the presence of 3% borax or 15% borax does not inhibit its formation.

(f) Cheever's X-ray diffractometer charts disclose that the pattern of peaks with the same peak intensities and locations of the standard X-ray diffractometer charts (DX 313–I, II and III) of water insoluble basic zinc stearate prepared by Miss Hartinger, is reproduced in each of the spectra 3 to 9, inclusive, on X-ray chart DX 327 of samples of coatings of the accused BL 246 process and the BL 248 process (no borax). Tr. 1340–43. The pattern of peaks with the same peak intensities and locations of the standard X-ray diffractometer chart (DX 317) of basic zinc stearate prepared by Miss Hartinger, is reproduced in each of the spectra 3 to 7, inclusive, on X-ray chart DX 320, of samples of coatings of the accused BL 235 process and the BL 232 process (no borax). Tr. 1394–1402. The matching of the basic zinc stearate patterns of peaks of the standard charts (DX 313, 317) with corresponding patterns of peaks in all spectra on charts DX 327 and DX 320 made from samples having BL 248 (soap only), BL 246 (soap-borax), BL 232 (soap only) and BL 235 (soap-borax) indicates that water insoluble basic zinc stearate is formed in the coatings of the accused processes and that the presence of 3% borax or 15% borax does not inhibit its formation.

(g) At the time of his early X-ray diffractometer charts of samples of the accused coatings, Dr. Cheever was unable to identify the basic zinc stearate peaks because that material was not recorded in the ASTM listings. Tr. 1316–1322. To determine whether a water insoluble compound was present in the coatings, he then boiled the accused samples in water and found that a whitish, waxy material was still present after boiling, which indicated that the whitish, waxy material was water insoluble. Tr. 1318. Chemical analysis of this boiled material determined that it contained zinc, carbon, hydrogen and oxygen, the elements of zinc stearate. Tr. 1320–21, 1517. X-ray diffraction charts (DX 318–I and II) show that the pattern of peaks of a boiled BL 235 sample closely matched the pattern of peaks of USP zinc stearate of the ASTM listing and no longer match those of an unboiled sample. Tr. 1319–20, 1323–27. Boiling of water insoluble basic zinc stearate in water converts it to water insoluble USP zinc stearate of the ASTM listing. Tr. 1319–20, 1323–27.

(h) Jones boiled in water both drawn and undrawn phosphated samples coated with the accused BL 235 and BL 246 lubricants and both drawn and undrawn phosphated samples coated with BL 248 (soap only) and the German material. He determined that a water insoluble organic compound remained on each of the samples after boiling. Tr. 1958–59,

1962–64, 1984–86, 1989–92. This water insoluble organic compound had been formed by a reaction between the zinc phosphate and the soap (DX 383). Neither Dr. Gibson nor Mr. Leland could remove by hot water the water insoluble organic compound formed by BL 235 over phosphate. Tr. 2199–2202; 847–48.

(i) McCullough of Hooker analyzed drawn and undrawn samples of the accused BL 235 process, TD–1286–Q (no borax) and the German process by the potentiometric titration method and determined that the coatings of each sample contained zinc stearate. Tr. 2107. Although he did not know the exact form of the zinc stearate, he had no doubt that the material he had found was a zinc stearate and that it was water insoluble. Tr. 2107.

(j) The uncontradicted testimony of record establishes that the Bonderlube 235 formula using 3% borax, 2% sodium nitrite and 95% reactive soap and applied over phosphate in an aqueous solution was developed by Parker for the speficic purpose of generating in a period of a few minutes the same water insoluble zinc stearate formed by the German process over a period of 15 hours. Tr. 843–48, 2186–2204. The 3% borax served as a buffer and maintained the pH content at the desired level to enhance the reaction between the zinc phosphate and the reactive soap. Tr. 843–48, 2186–2204. The 2% sodium nitrite served as an anti-corrosive substance, Chicago Tr. 800–802, and there is no evidence that the sodium nitrite reacts or coacts with any other elements to form new compounds or perform the function of a meltable solid inorganic compound.

(k) The use of 15% borax in the accused BL 246 process is in accordance with the disclosures of the prior art Orozco-Henricks patent 2,469,473, DX 1, Col. 8, lines 5–19, and prior art Whitbeck patent 2,470,062, DX 3, wherein soap-borax lubricants are used over bare steel. The Whitbeck patent teaches that the borax to soap ratio may be varied from one metal forming process to another for a number of reasons, and that

(1) A higher soap content provides better lubrication at lower temperatures and a higher borax content provides better lubrication at higher pressures and higher temperatures, Col. 3, lines 11–15;

(2) The physical characteristics of the metal, the type of dies, die tolerance and clearance and surface finish and depth and complexity of the draw must be considered, Col. 3, lines 38–42;

(3) Deep draws and resultant high pressures and temperatures usually require a higher borax to soap ratio than lighter draws with lower temperatures and pressures, Col. 3, lines 45–48;

(4) The proper soap to borax ratio may be determined by a few trials with the particular dies and metal stock to be used, Col. 3, lines 62–66.

(*l*) The pattern of peaks in Curve 1 of the standard control chart DX 313–I, Curve 2 of DX 313–II and Curve 2 of DX 313–III, cannot establish the presence of barium stearate, as plaintiffs contend. Those standard charts were run on samples of Hooker or basic zinc stearate prepared by Miss Hartinger from known elements of which barium was not one. Tr. 1906–09. The same pattern of peaks occurs in the X-ray diffractometer charts of the accused coatings, DX 320, 322, 327 and PX 74, and barium is not present in those coatings. Chemical analysis of Miss Hartinger's basic zinc stearate also showed that barium is not present. Tr. 1320–21. In any event, the sample used by Dr. Cheever for the standard charts DX 313–I, II, and III, was water insoluble, as were the residues recovered from the coated workpieces after boiling in water. Tr. 1319–20.

13. Plaintiffs have not shown by a preponderance of the evidence that the accused processes left defendants with no cleaning problem. In none of the processes was it possible to remove by hot or boiling water the water insoluble organic soap film left in the coating after the draw.

(a) Alkaline cleaners were unable to remove the residue of the BL 235 in the plunger process, and a mild acid type solution (Parco 532) was necessary. Tr. 790.

(b) Hot water would not remove the residue of the BL 235 rocket process. A strong alkaline cleaner containing 20% caustic was necessary. PX 99, pp. 44–45.

(c) The BL 246 bumper process required the same multistep chemical cleaning process as the previous process using a sticky oil. PTO 10. Defendants used Wyandotte, Ferlon, McDermid and sulphuric acid cleaners, PTO 10, the same cleaners used before, and there is no indication of improvement with BL 246.

The cleanability tests performed by Dr. Rabinowicz and Friedberg would have been more persuasive if they had been able to more closely approximate operating conditions and if they had used parts deformed under heat and pressure with the lubricant thereon. Tr. 95–104, 334, 449–50, 450–57. In any event, they did not demonstrate that the films were removable without a "cleaning problem."

14. The plaintiffs have failed to prove by a preponderance of evidence that the die life was greatly increased, as discussed by the Court of Appeals of the 7th Circuit (321 F.2d at 237).

(a) As to the accused BL 246 Pontiac bumper forming process, the dies lasted the entire 1956 model run but so did the previous dies where the Marproof (sticky oil) lubricant was used. Tr. 715; PX 103, p. 39. The 1956 dies of the accused process still had to be stoned periodically to eliminate die loading and pickup so as to prevent galling and scratching of the parts, and hand polishing to eliminate scratches and scoring also was still necessary, although to a lesser degree. Tr. 694–95, 715. It was still necessary to apply tallow or grease over the dried film to aid in lubrication of areas where deep draws occurred. Tr. 708.

(b) There is no evidence that die life was increased by the accused BL 235 plunger process. The plunger formerly was machined out of solid bar stock, which did not involve dies. Tr. 760–61.

(c) The accused BL 235 process did not greatly increase tool and die life in the extrusion of the rocket at Pontiac. Until the time the rocket contract was canceled by the U. S. Government, the dies and punches continued to break. The BL 235 process did not prevent that breakage. Tr. 730, 750; PX 97, pp. 24–25. The rocket dies had a shorter life than the life of Pontiac's regular automobile production dies, although BL 235 was used over phosphate. Tr. 750–51.

(d) In his tests plaintiffs' witness Lenz formed only 24 or 25 pieces using BL 215 (no borax) over phosphate, only 24 or 25 pieces using BL 235 over phosphate and only 24 or 25 pieces using BL 246 over phosphate. Tr. 308–09, 311. The effect of different lubricants on die life can only be determined by extended periods of use wherein many thousands of pieces are used and examined. Plaintiffs' Court of Appeals Brief, page 9. Lenz stated that one BL 215 piece had a burr, one BL 235 piece had no burr and one BL 246 piece had no burr. Tr. 291–92. He did not examine the other BL 215, BL 235 and BL 246 pieces. Tr. 311. In the accused BL 246 process as used in production, burrs were formed and had to be removed in a separate operation. PTO 9.

## CONCLUSIONS OF LAW

Upon the foregoing findings of fact, the Court concludes as a matter of law as follows:

1. The Court has jurisdiction of the parties and the subject matter of the issues raised by the pleadings of the parties herein.

2. Plaintiffs have the burden of proving patent infringement by a preponderance of the evidence.

3. The construction of a claim when its validity is contested controls the construction of that same claim when its infringement is alleged. The patentee cannot urge a restrictive interpretation of his claim to avoid invalidity and then

an expansive interpretation to ensnare infringers. Devex v. General Motors, 263 F.Supp. 17, 25 (D.Del.1967); Devex v. Houdaille, 382 F.2d 17, 23 (7th Cir., 1967).

4. Plaintiffs have not shown by a preponderance of the evidence that the accused processes achieve the same "new and unexpected results" which formed the basis of the holding of validity of Claim 4 of the Henricks patent in suit by the Court of Appeals for the Seventh Circuit.

5. There is no preponderance of the evidence in favor of plaintiffs that in the accused processes (a) there is a new co-action between the soap, borax and phosphate, (b) new compounds or glassy amorphous compounds are formed, (c) the formation of water insoluble organic compounds is inhibited, (d) tool and die life is greatly increased, and (e) there is no cleaning problem, or that any of these results is achieved. The credible evidence is to the contrary and preponderates in favor of defendant.

6. Defendant's bumper forming process practiced at its Pontiac Motor Division plant during 1955 and 1956 using Bonderlube 246 over a zinc phosphate coating formed from Spra-Bonderite 111X was not an infringement of Claim 4 of Henricks Patent No. Re. 24,017.

7. Defendant's extrusion process practiced at its Diesel Equipment Division plant in 1955 and 1956 in the forming of valve lifter plungers using Bonderlube 235 over a zinc phosphate coating formed from Bonderite 181X was not an infringement of Claim 4 of Henricks Patent No. Re. 24,017.

8. Defendant's rocket forming process practiced at its Pontiac Motor Division plant during 1952 and 1953 in the forming of rocket heads and rocket motor bodies for the United States Government using Bonderlube 235 over a zinc phosphate coating formed from Bonderite 180X was not an infringement of Claim 4 of Henricks Patent No. Re. 24,017.

9. Defendant is entitled to entry of a judgment dismissing the Amended Complaint herein and awarding defendant its taxable costs on the infringement issue.