**TELEDYNE MID–AMERICA CORPO-
RATION, Plaintiff,**

v.

**INTERNATIONAL TELEPHONE & TEL-
EGRAPH CORPORATION, Defendant.**

**Civ. A. No. 3778.**

United States District Court,
D. Rhode Island.
March 18, 1971.

Roy H. Olson, Richard Bushnell, and Richard A. Giangiorgi, of Olson, Trexler, Wolters & Bushnell, Chicago, Ill., A. Lauriston Parks, of Jordan, Hanson & Curran, Providence, R. I., for plaintiff.

Dana M. Raymond, and Robert Neuner, of Brumbaugh, Graves, Donohue & Raymond, New York City, George M. Vetter, Jr., of Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for defendant.

## OPINION

PETTINE, District Judge.

This is an action brought under 28 U.S.C. § 1338 by Teledyne Mid-America Corporation (hereinafter Teledyne) against International Telephone & Telegraph Corporation (hereinafter I.T.T.) alleging infringement of United States Letters Patent No. 2,867,001 (hereinafter "001 patent").

Teledyne is a corporation existing under the laws of Delaware, having been substituted for Western Insulated Wire Company, the original plaintiff in this action, in accordance with Rule 25 of the Federal Rules of Civil Procedure.

The defendant, I.T.T., is a Maryland corporation with a regular and established place of business in the District of Rhode Island, where it is claimed the defendant carried out, prior to the filing of this suit, the acts of infringement. Venue is therefore proper in accordance with 28 U.S.C. § 1400(b).

The defendant denies that it has infringed the "001 patent" and challenges its validity on three grounds: 1) lack of invention;[1] 2) vagueness, indefiniteness, and failure to point out and distinctly claim the alleged invention;[2] and 3) lack of novelty.[3]

---

1. 35 U.S.C. § 103 provides:

 § *103. Conditions for patentability; nonobvious subject matter*

 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

2. 35 U.S.C. § 112 states as follows:

 § *112. Specification*

 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

 An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

3. For the relevant statutory provisions on this issue, see text, *infra*, under "NOVELTY."

The "001 patent" issued on January 6, 1959, to the Western Insulated Wire Company, its successors or assigns. On April 11, 1967 the instant action was filed.

The patent in suit covered a "Means and Method for Forming Indicia on the Surface of Continuous Vulcanized Products." Essentially, the patent application disclosed a device for effecting the indent imprinting of letters, numbers, symbols and other indicia into the outer sheath of electrical cable while the cable was being processed through a long continuous vulcanizing (CV) tube. The metallic conductor, or core, is first passed through an extruder, which fits a polymer material around the core. From the extruder, the now-jacketed cable enters a vulcanizing steam chamber containing a sufficient atmosphere of steam to cause vulcanization (or "curing") of the polymer sheath, which is in a plastic state before entering the chamber. The application for the "001 patent" further disclosed that very shortly after entering the chamber, and not before the moment at which the vulcanizing atmosphere commences its effect upon the surface of the sheath, the cable passes between two rollers, one of which has printing dies on its periphery, themselves heated to a vulcanizing temperature, so that with a sufficient application of pressure between the rollers, the sheath is imprinted with the desired indicia. The completely vulcanized and imprinted product emerges at the opposite end of the CV tube. Both the entrance and exit to the CV tube are tightly sealed around the cable to prevent the steam from escaping.

The relevant art here is commercial vulcanization which requires that material such as electrical cable be subjected to relatively high temperatures and pressures during which it is transformed from the soft plastic condition to a tough, relatively hard, dense and resilient condition.

The vulcanization process is a progressive one and standard curves show that upon being subjected to heat and pressure, the insulating material will initially and for a very short instant increase in softness and then the softness and plasticity of the material is progressively reduced until it reaches its final tough, resilient, and relatively hard and dense vulcanized condition. Such vulcanization commences at the surface or skin of the material and progresses toward the center of the cable.

## VALIDITY

A. Novelty

1. *Prior Public Use*

35 U.S.C. § 102(b) provides:

> "§ 102. *Conditions for patentability; novelty and loss of right to patent*
>
> A person shall be entitled to a patent unless—
>
> \* \* \* \* \* \*
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

While admitting that it has processed indent-printed cable in a continuous vulcanizer, defendant I.T.T. has presented evidence in support of its contention that as early as March 1953 the Cornish Wire Company (hereinafter Cornish), a division of General Cable Corporation, at its plant in Williamstown, Massachusetts, made commercial use of a process which anticipated the invention claimed in the "001 patent" and which invalidates the "001 patent" because Cornish's method was in public use more than one year prior to the date of application for the "001 patent"—i.e. before December 3, 1953.

Defendant has the burden of proof of invalidity of this patent. Plaintiff contends, and defendant concedes, that the proper standard is proof beyond a reasonable doubt, citing Heyman Mfg. Co. v. Hap Corp., 196 F.Supp. 447 (D.R.I. 1961), wherein Judge Day explained the

need for that exacting standard as follows:

"The situation presented is governed by the rule of law that when a person charged with infringement of a patent seeks to establish anticipation by means of oral testimony he must do so by proof that leaves no reasonable doubt as to the fact. This rule of law is clearly stated in The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.) 1892, 143 U.S. 275, at page 284, 12 S. Ct. 443, 447, 36 L.Ed. 154, where the Supreme Court said:

' * * * Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer. The doctrine was laid down by this court in Coffin v. Ogden, 18 Wall. 120, 124 [21 L.Ed. 821], that "the burden of proof rests upon him, [the defendant,] and every reasonable doubt should be resolved against him. * * *" This case was subsequently cited with approval in Cantrell v. Wallick, 117 U.S. 689, 696 [6 S.Ct. 970, 29 L.Ed. 1017], and its principle has been repeatedly acted upon in the different circuits * * *.' "

196 F.Supp. at 453.

In the instant case defendant has presented substantial tangible evidence in addition to oral testimony. Whether that is sufficient to remove the unusually heavy burden, for a civil case, of "proof beyond a reasonable doubt" defendant has not chosen to argue. See, however, United Kingdom Optical Co. v. American Optical Co., 68 F.2d 637 (1st Cir. 1934). I do not reach that question here, for the result is the same regardless of the standard applied to defendant's evidence of prior public use.

Based upon the evidence presented, I find, with respect to the issue of prior public use:

1) Cornish, through its then Sales Manager, J. B. Baxter, applied on September 7, 1951, to a Regional Director of the United States Bureau of Mines, for safety approval of its product designated as SO Type Cord. That application stated, in relevant part:

"We would call to your attention the fact that these cables at present are not marked in accordance with your requirements. However, we are in a position to imprint directly into the rubber on the outer jacket the approval number, if granted, along with other pertinent information as to the size, type and construction of the cord."

Baxter testified that this meant that Cornish was "in the process of developing methods of indent printing the cable."

2) Safety approval was granted by the Department of Mines of the Commonwealth of Pennsylvania on January 14, 1952, based on tests of the non-imprinted cable which had been submitted by Cornish. The Approval Number P—117 was granted for identification of this cable.

3) Cornish offered for sale, in Section V, page 4 of a trade catalog published March 1, 1953, an extensive line of coroprene (trade name for neoprene rubber)

insulated portable cords, one attribute of which was that:

"They have successfully passed the flammability test of the United States Bureau of Mines as well as the Pennsylvania Bureau of Mines * * *. The symbol P–117BM, along with other data, is molded into the jacket to identify the cord as being acceptable for this special service."

4) Further strengthening the defendant's position, it was established, and I so find, that in early 1953, Mr. J. B. Baxter, the then Sales Manager of Cornish, had written the text of the trade catalog that had a general distribution of at least 5,000 copies, offering for sale SO Cords which were indent printed by a printing wheel with guide rolls installed in a continuous vulcanizer tube identified as the #6 CV line and that prior to March 1953, he had actually seen the marking wheel and guide rolls located in a steam chamber mounted on said line. Mr. Baxter further testified that Cornish only displayed in their trade catalog those items which were available for sale at that time.

5) Mr. John Cook, one of the founders of Cornish, was thoroughly familiar with the art of continuous vulcanizing of cables and was the designer of the initial CV unit at Cornish's plant at Williamstown which he frequently inspected. As early as April 30, 1952, sketches were made by Mr. Cook from which detailed specifications were made by Cornish's draftsmen, embodying the concept of a marking wheel inside a continuous vulcanizer, which drawings were later reduced to practice by Cornish. For example, there was testimony of Mr. David Cassidy, plant superintendent for Cornish in 1952, who completed a drawing on April 30, 1952, showing a wire marking steam box, wire marking guide unit, and wire marking guide wheel in a steam box—which apparatus was constructed and used to indent print cable. It was the successful operation of this model which led to the purchase and installation in 1952 of a continuous vulcanizing tube identified as the #6 CV

line. And in early 1953, the then maintenance foreman of Cornish installed a steam chamber in the tube, with a marking wheel inside the chamber. I so find though I realize it was a question of recollection by this witness of events many years past. However, the totality of the evidence and the evaluation of the witness on the stand causes me to accept his testimony as true and accurate.

6) Prior to the invention disclosed and claimed in the patent in suit, indent printed cables had been produced utilizing a "pan tuber" method, wherein the indicia were formed prior to delivery of the cable to a vulcanizing chamber, which involved extruding the plastic sheath upon the wire, printing the desired information onto the sheath out in the open, and placing a length of the cable into a pan for delivery to an autoclave for vulcanization. However the "pan tubers" could also be used to produce non-indent printed cable. Another method, called the "lead press" process employed a pre-formed stencil, which was placed against the cable sheath and was then covered by a lead jacket, which jacket was stripped off, along with the stencil, following vulcanization.

As explained in the application for the "001 patent," such prior methods were relatively slow, expensive, and not always capable of forming indicia of satisfactory depth and clarity.

7) I find that Cornish has never indent printed vulcanized cable by any method other than by the use of a marking wheel installed inside a continuous vulcanizer tube, and that the "pan tubers" which Cornish owned produced only unmarked cable.

8) On September 20, 1960, United States Letters Patent No. 2,953,085 (hereinafter "085 patent") was issued to the same Mr. John Cook who was a founder of Cornish and an expert in the field of indent imprinted cable, covering an "Apparatus for and Method of Marking Continuous Stock in Motion." The application therefor was filed on September 7, 1955. In describing the state

of the prior art, the applicant remarked as follows:

> "In thus marking stock, and especially rubber-coated core stock, such as an electric cable, as it continuously emerges from an extruder head and passes into and through a vulcanizer, it is the further general practice to pass the stock through an initial vulcanizer section, then between marking rolls externally of the vulcanizer, and finally into a succeeding main vulcanizer section * * * ."

The method patented in the "085 patent" is substantially the same as that used by the defendant.

9) Cornish has employed its indent printing apparatus in the ordinary course of commerce since 1953 and there have been no special secrecy restrictions at the Williamstown plant in connection with its use nor restrictions upon access by employees to the area of operation of the continuous vulcanizer lines or the indent printing steam chambers installed therein.

These findings of fact on the issue whether Cornish employed a process which anticipated the "001 patent" at some time before December 3, 1953, demonstrate that Cornish represented to the Bureau of Mines that it could, on September 7, 1951 imprint the SO Type Cable, and that it later advertised, in March, 1953 an offer to sell indent-imprinted coroprene insulated cords. These facts alone would obviously be insufficient to prove that its system of indent imprinting was the same as that disclosed in the "001 patent."

However, defendant further points to the testimony of the various witnesses as to their own observations and work at Cornish and the established fact that the only method of imprinting cable which was ever employed by Cornish was that of a marking wheel inside a steam chamber. Therefore, since at least March, 1953, Cornish would have been offering for sale cable which was indent imprinted in the manner subsequently disclosed in the "001 patent."

The strongest evidence to the contrary is found in the "085 patent" application from which plaintiff argues the unlikelihood that Mr. Cook, an expert in the field of continuous vulcanizing, who was also the owner of Cornish and was thoroughly familiar with its operation, in applying for the "085 patent," would have failed to disclose the very operation which allegedly had already been employed at his own plant for over a year and a half.

True the Cook patent described as the prior "general practice" a method and apparatus wherein marking was accomplished by a roller disposed externally of the vulcanizing chamber, which method and apparatus are significantly different from those asserted by the defendant's witnesses. Plaintiff argues further that the Cook application contained claims to essentially the same invention as that claimed in the "001 patent," and that Cook's failure to cite the alleged activities at Williamstown in 1953 indicates that Cook did not believe that the invention had been in commercial use in 1953. Nevertheless, I am constrained to reject the plaintiff's position.

To begin with, the Cook application as filed was drafted by a Mr. Walter Spruegel, from drawings supplied to him by the Standard Machinery Company, owner of the Cook patent, for whom he was a patent agent. He never met Mr. Cook nor did he ever receive from him any communication as to the state of the art in the vulcanizing field, including indent printing practices. There is no evidence that he had any knowledge of the commercial practices or other activities at the Cornish Wire Company.

Further weakening the reliability of the plaintiff's contention that the Cook patent raises a doubt concerning the early indent printing practices at the Cornish Williamstown plant are the circumstances attending the preparation and filing of the application. The evidence discloses that Mr. Cook had been in poor health and had undergone two surgical operations. On August 30, 1955, the original copy of the patent ap-

plication as prepared by Mr. Spruegel was forwarded to Mr. Cook by the Standard Machinery Company and on September 2, 1955—making no changes or suggestions in the application whatsoever—Mr. Cook executed it. On September 17, 1955, within two weeks of the filing date, John Cook, fearing he was suffering from incurable cancer, ended his own life. Furthermore, there is no evidence that John Cook was knowledgeable of the legal significance of the term "public use."

On this latter question, of what constitutes "public use," this Court has already expressed its view, in its ruling upon defendant's motion for summary judgment herein. In denying that motion I said:

"* * * there can be no doubt, on the present state of the record, that if Cornish did in fact commercially produce indent printed cable by a process which anticipated the '001 patent,' that was a 'public' use. It is a well-established principle of patent law that the mere fact that a process is carried on within the confines of a machine which could not disclose the process through external viewing does not make that process 'secret.' Gillman v. Stern, 114 F.2d 28, 31 (2d Cir. 1940), cert. denied, 311 U.S. 718 [61 S.Ct. 441, 85 L.Ed. 468] (1941). This Court cannot improve upon the excellent analysis of the legal distinction between active concealment of an invention and the mere fact that it is buried invisibly in an enclosed machine, which is contained in Chemithon Corp. v. Procter & Gamble Co., 287 F.Supp. 291, 306–14 (D.Md. 1968), aff'd, 427 F.2d 893 (4th Cir.), cert. denied, 400 U.S. 925 [91 S.Ct. 186, 27 L.Ed.2d 185] (1970). Thus whatever process for indent imprinting was used by Cornish, its use at the Williamstown plant was clearly

'public' within the meaning of § 102(b)."

Cf. Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342 (1958).

The statements of the defendant's witnesses and the various exhibits strengthening their testimony are compelling. Exercising my prerogative as the fact finder I find these witnesses convincing and the weight of their testimony sufficiently establishing the required proof. I find the "001 patent" invalid by reason of the commercial practice at the Williamstown plant of the Cornish Wire Company more than one year before the filing date of the Lewis patent, pursuant to 35 U.S.C. § 102(b).

Though this conclusion is dispositive of this litigation, I will consider *seriatim* the remaining issues relating to validity, for the purpose of appellate review.

*2. Prior Knowledge*

35 U.S.C. § 102(a) provides:

"A person shall be entitled to a patent unless—a) the invention was known or used by others in this country or a foreign country, before the invention thereof by the applicant for patent * * *."

The parties here agree, in their post-trial memoranda of law, that the earliest date in the record upon which the patentee's invention can be claimed to have occurred is May 14, 1953. Defendant contends, as an additional ground for invalidity of the "001 patent," that the invention claimed therein was known by the Cornish Wire Company prior to that date. On this point also defendant is conceded to bear the burden of proof beyond a reasonable doubt. See generally Deller's Walker on Patents (2d ed.), § 81. Based on the findings of fact set forth above, I find reduction to practice of a substantially similar machine [4] em-

---

4. I fully realize that this finding goes beyond that which appears to be required to establish anticipation. See e. g., Application of Borst, 345 F.2d 851, 52 CCPA 1398 (1965), cert. denied sub nom.

Borst v. Brenner, 382 U.S. 973, 86 S.Ct. 537, 15 L.Ed.2d 465 (1966) holding that reduction to practice, either actual or constructive, is not necessary.

ploying the method claimed in the patent (see, e. g., Atlas v. Eastern Airlines, Inc., 311 F.2d 156 (1st Cir. 1962); In re Schlittler, 234 F.2d 882, 43 CCPA 986, (1956)), which was commercially operational and not merely experimental (see, e. g., Egbert v. Lippman, 104 U.S. 333, 26 L.Ed. 755 (1881)) and was not concealed (see discussion, *supra,* of "public" use), and which was used to achieve the same result as that set forth in the specifications to the "001 patent."

3. *Prior Invention in Another*

35 U.S.C. § 102(g) provides:

"A person shall be entitled to a patent unless—(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

It necessarily follows from the findings of fact and the above discussion that the "001 patent" is also invalid on the ground of prior invention by Mr. Cook and his associates at the Williamstown plant.

## B. *Indefiniteness*

The plaintiff has selected claims 3, 6, and 7 as being representative of all the claims contained in the "001 patent"[5] and I will, therefore, consider only these in relation to 35 U.S.C. § 112.[6]

5. *The Claims*

3. The method of forming indicia on the surface of a vulcanizable sheath of a continuous product consisting in extruding the sheath in a plastic state into an atmosphere of vulcanizing heat and pressure, and *after a minor period of exposure of the conduit sheath to said atmosphere as compared to the period required to sheath vulcanization and not earlier than about the moment sheet [sic] surface vulcanization commences,* the step of molding indicia of substantial thickness on the surface of the sheath under pressure while the sheath is in such atmosphere and while in its plastic state by means of a die heated to a vulcanizing temperature, and thereafter completely vulcanizing the sheath throughout.

6. In a mechanism for vulcanizing indicia on the sheaths of conduits, the combination of a walled vulcanizing chamber having a conduit entry and exit in opposite walls, an extruder for molding a plastic sheath on a conduit and directing the assemblage through said chamber, and metallic rolling indenting die arranged in said chamber engageable with said sheath to form indicia on the surface thereof under heat and pressure as the assemblage is advanced through said chamber, and said *indenting die being spaced from the conduit entry such a distance that outer sheath body plasticity will be decreased and its density increased by vulcanizing chamber* action but without actual vulcanization taking place prior to action of the die, whereby better die-produced compacting of the sheath body at the site of and inwardly of the indicia walls will be effected.

7. In the production of indicia on the surface of continuous longitudinally traveling vulcanized products wherein the indicia is characterized by being defined by side walls and wherein the product is initially formed with an extruded sheath of a vulcanizable polymer in a plastic state which is subsequently subjected to vulcanizing temperature and pressure in vulcanizing atmosphere to thereby render it stable, the indicia-producing *method which consists in subjecting the traveling sheath to an outer body area plasticity-reducing and density-increasing action of said atmosphere for a period of time less than that required to start exterior surface vulcanization, and then molding the indicia on the extruded plastic sheath immediately before vulcanization of the material in toto,* by application to the plastic sheath under pressure of a mold bearing the indicia heated to a vulcanizing temperature whereby the surfaces of the walls of the initially molded indicia will be compacted and vulcanized so as to be sustained against distortion and be maintained sharp and well defined during subsequent vulcanization of the sheath.
(emphasis added)

6. See note 2, *supra.*

### 1. *Claim 3*

Claim 3 of the "001 patent" sets forth a progression and teaches that the indent printing of the indicia takes place after a minor period of exposure of the sheath to the vulcanizing atmosphere inside the tube and "not earlier than about the moment [sheath] surface vulcanization commences * * *." Since the claims must be read and interpreted in light of the specifications and file history of the patent,[7] this must mean that the plasticity-reducing and density-increasing action have occurred before the start of vulcanization and that it is at about this moment the marking must take place.[8]

Defendant contends that those time periods are indeterminable, that the point in the steam chamber where the marking wheel should be placed in order to achieve the intended result cannot be found, and that therefore the "001 patent" is void for vagueness under § 112. Recognizing the rule that a patent is directed to those skilled in the art and not to lay persons,[9] I look to the record, particularly to the testimony of plaintiff's expert, but I find little to support the plaintiff's position. That expert stated, in substance, that the whole sequence of processing stages proceeds concurrently and yet he conceded that there is no known way of determining either:

a) the density of the cable as it proceeds through the CV tube; or

b) a measurable distance in the tube for the occurrence of plasticity-reducing or density-increasing effects; or

c) the moment when the vulcanization of the outer surface of the cable sheath begins inside the CV tube. His only point of limitation for the location of the marking wheel is that point in the tube where you can no longer mark.

I find this vagueness is in violation of the very teaching of claim 3 of the patent, for that claim, read in the light of the specifications set forth in note 8, *supra*, relates the proper location of the marking wheel to a point after the plasticity-reducing and density-increasing actions have taken place which is when sheath surface vulcanization commences—a point which cannot be determined by the plaintiff's own expert. I cannot accept plaintiff's position that marking merely must occur after some degree of surface vulcanization has taken place, and that it doesn't matter if substantial vulcanization has occurred so long as cable plasticity exists. That argument flies in the face of the specifications which state that the invention may

7. Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721 (1935) ; Borg-Warner Corp. v. Paragon Gear Works, Inc., 355 F.2d 400, 403 n. 2 (1st Cir. 1965), cert. denied, 384 U.S. 935, 86 S.Ct. 1461, 16 L.Ed.2d 536 (1966).

8. See Column 1, lines 66–71, and Column 3, lines 12–17 and 21–25, of the specifications :
 "Generally considered, the invention contemplates forming the indicia in the surface of the extended sheath or covering very shortly after it enters the vulcanizing atmosphere of a vulcanizing chamber and while the material of the sheath is plastic and unvulcanized, although preferably at about the time sheath surface vulcanizing commences."
 *"This die engagement is after the outer sheath body plasticity-reducing and density-increasing action of the steam has taken place and is at* the moment of commencement of the vulcanizing action on the surface of the sheath and before development of such action through the body of the sheath occurs which latter action ordinarily takes place in about five seconds."
 "The important feature of the invention is the application of the revolving heated die under pressure to the advancing extruded cable sheath D at a point in the vulcanizing chamber where the sheath is still plastic or unvulcanized so that the dies will readily mold indicia on the sheath * * *"
 (emphasis added)

9. See, e. g., Eibel Process Co. v. Minn. & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923) ; Hazeltine Research, Inc. v. Dage Electric Co. Inc., 271 F.2d 218 (7th Cir. 1959)

in general terms be described as a means and method of:

"* * * forming the indicia on the surface of the extended [sic] sheath or covering very shortly after it enters the vulcanizing chamber and *while the material of the sheath is plastic* and *unvulcanized* * * *" Column 1, lines 67–71 (see also column 3, lines 12–18 of the patent specifications) (emphasis added).

Furthermore, there is no teaching in the patent to determine the point of the termination of plasticity—a critical point, since claim 3 requires molding while the sheath is in its plastic state. Referring again to the record, the plaintiff's expert testified that he could only say plasticity has come to an end when the marking wheel is no longer able to mark the cable (i. e., the die can no longer make an impression upon the surface of the sheath) and further stated that "vulcanization of the material in toto" means only that "plasticity is no longer in existence." That circular definition does not meet the specificity requisite to the upholding of patent claims. As was observed by the Court in General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 368–369, 58 S.Ct. 899, 901–902, 82 L.Ed. 1402 (1938):

"Recognizing that most inventions represent improvements on some existing article, process or machine, and that a description of the invention must in large part set out what is old in order to facilitate the understanding of what is new, *Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.'* [footnote omitted] Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. *The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public.* [footnote omit-

ted] The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. [footnote omitted] The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' [footnote omitted]"

In that case the Supreme Court applied those maxims of patent law to the following claim:

"25. A filament for electric incandescent lamps or other devices, composed substantially of tungsten and made up mainly *of a number of comparatively large grains of such size contour as to prevent substantial sagging and offsetting* during a normal or commercially useful life for such a lamp or other device."

The Court observed as follows:

"The claim is invalid on its face. *It fails to make a disclosure sufficiently definite to satisfy the requirement of R.S. § 4888, 35 U.S.C. § 33.*"

304 U.S. at 368, 58 S.Ct. at 901.

Continuing, the Court concluded:

"But the vice of a functional claim exists not only when a claim is 'wholly' functional, if that is ever true, but also when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the *exact point of novelty.*" (emphasis added).

304 U.S. at 371, 58 S.Ct. at 903.

To the same effect, see e. g. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946); Standard Brands, Inc., v. Nat'l. Grain Yeast Corp., 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17 (1939); Rice v. Nash-Kelvinator Corp., 150 F.2d 457 (6th Cir. 1945).

The plaintiff next argues that the range or limits within which the plasticity of the sheath allows it to be marked is a factor to be determined by the exer-

cise of sound judgment of persons knowledgeable in the vulcanization art, rather than by the application of a formula. Thus, it remains for this Court to determine whether or not it is being too much of a purist in applying the language of the claims, so as to disregard precedent that has recognized as acceptable in applying the teachings of a patent, the exercise of judgment and experimentation. For example, the Court stated in Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 257 (7th Cir. 1960), app. dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961):

> "There is no requirement that quantitative values for such factors as voltage, spacing and liquid characteristics be recited. The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to particular material or to obtain the particular results desired does not impair validity of the patent."

And in Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), we find such pertinent language as:

> " * * * those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be afforded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case."

However, it is my opinion that in the case at issue, the area of uncertainty which claim 3 leaves open is of such magnitude as to justify the denial of validity on the ground of indefiniteness. Experimentation and exercise of judgment are, of course, permissible when they take place within an area capable of meaningful and tangible definition. Absent some definable limits, there is no determinable point of invention, and consequently no valid patent, at least where, as here, the prior art discloses the broader teaching of the claim (in this case, the placing of a marking wheel inside a CV tube). It must be assumed that at *some* point or points in the CV tube there is noninfringement, for otherwise plaintiff's patent would apply *anywhere* in the chamber, which construction was clearly and properly rejected by the Patent Office.

This conclusion is inevitable when the primary detrimental effects of a vague patent are considered:

1) other potential developers of the same field of knowledge are discouraged from experimentation because of the possibility that whatever inventions they might develop might be construed to be covered by the indefinite claims of the existing patent;

2) others who may wish to employ similar devices which they in good faith think are in the public domain may be caught in the infringement net of the indefinite claim, and thus the patentee is able to monopolize a greater pool of knowledge than that to which a carefully-drawn patent would entitle him; and

3) it remains unclear exactly what reverts to the public domain at the expiration of the statutory period.

Particularly is this so when, as here, the failure to sufficiently describe the claimed invention occurs at the precise point of invention. That is, as will be discussed *infra*, the "001 patent" clearly would never have issued if the patentee had only claimed, as he attempted to do in his initial application, that his invention was essentially the placing of a marking wheel inside a CV tube chamber. The Patent Office rejected those claims as obvious. Only after the patentee had *narrowed* his claims, to locate the precise location of the marking wheel in order to achieve the desired re-

sult did the patent issue. Obviously, therefore, a determination of that point is critical to any attempt to practice claim 3, and specificity thereof is crucial to the upholding of that claim.

We have the testimony of plaintiff's expert that as one skilled in the art, he can apply the teachings of the patent. This was a conclusory assertion without explanation differentiating the allowed claims as against those disallowed and disclaimed by the applicant. Further questioning revealed his belief that it is impossible to determine, either in terms of time or of distance, the permissible locations for the marking wheel. That is, since it cannot be determined with any degree of precision when "sheet [sic] surface vulcanization commences" nor when the sheath ceases to be "in its plastic state," one who is skilled in the relevant art cannot, by reading claim 3 (along with the drawings and specifications), determine where to place the heated die.

■ It is important to note at this point exactly what this Court is and is not holding, as to the issue of indefiniteness. Since there are numerous external factors contributing to a determination of the proper location of the marking wheel (some of which are the speed of the cable through the CV tube, the diameter of the cable, the composition of the sheath and the temperature and pressure inside the steam chamber), it can be readily observed that if a patent applicant is to obtain any meaningful protection for his invention, his claims must be drawn in somewhat general terms. Otherwise it would be very easy for another to use the fruits of the patentee's invention without ever incurring liability as an infringer, simply by varying one of these external factors. This appears to be possible even though, by application of the doctrine of equivalents, the standard for infringement is that of "[*substantially* the same machine performing] substantially the same function in *substantially* the same way." See Shields-Jetco, Inc. v. Torti, 314 F. Supp. 1292, 1301 (D.R.I.1970), aff'd, 436

F.2d 1061 (1st Cir. 1971). Thus I might find claim 3 sufficiently definite under § 112 if there were testimony that the location of the wheel could be determined, by formula or experimentation or otherwise, whenever these numerous variables are assigned new values. In fact the testimony before me indicates that none of the effects (e. g., plasticity) set forth in the claim are measurable or determinable quantities. In short, the testimony of plaintiff's own expert disclosed that claim 3 does not provide any means of distinguishing between what is claimed to be inventive and what the Patent Office previously rejected as obvious. All this leads me to the conclusion we have nothing more than a recitation of indeterminable ranges in this claim, which indefiniteness is fatal to its validity.

> "If the subject matter of the patent is such that the patentee cannot verbalize his invention comprehensibly or is incapable of ascribing reasonable limits to his claims, regardless of intrinsic merit his invention cannot be patented * * *"

Georgia-Pacific Corp. v. United States Plywood Corp., *supra*, 258 F.2d at p. 136.

### 2. *Claim 6*

As to claim 6, I find the defects recited as to claim 3 equally applicable. It tells us that the marking wheel must be located from the conduit entry at such a distance that the outer sheath body plasticity will be decreased and its density increased by vulcanizing chamber action but without actual vulcanization taking place. Again, plaintiff's expert conceded that it cannot be determined where any of those critical points lies.

### 3. *Claim 7*

Claim 7 offers the same insoluble problems of indeterminable progression points of plasticity-reducing and density-increasing actions for a time less than that required to start vulcanization on the outer surface of the sheath, coupled with a requirement that the indent printing take place before vulcanization

of the material in toto. I need not repeat my reasoning that even in the light most favorable to the plaintiff's position it does not teach how to determine the end of the plastic state, and plaintiff's own expert testified that "vulcanization of the material in toto" means that the "plasticity is no longer in existence." In other words, the claim does not provide any definite or useable standards for determining the latest point at which molding of the indicia may take place or for determining the range of useable locations.

In summary, claims 6 and 7 are infected with the same fatal defects as claim 3 and are likewise invalid. The instructions in those patent claims for locating the marking wheel in relation to a stated sequence of processing stages in the CV tube are therefore totally devoid of practical or operational significance.

### C. Lack of Invention—Obviousness

The file history discloses that the Patent Office rejected all of the original claims filed by the plaintiff's assignor as unpatentable over the prior art on the basis that with an apparatus consisting of a vulcanization chamber attached to an extruder, it would be obvious to install the indenting rollers within the vulcanizer near the extruder. This conclusion can hardly be disputed.[10]

 However, as recited under "indefiniteness," *supra*, the applicant subsequently amended his claims, in an attempt to define more precisely the specific location within the steam chamber where the marking wheel was to be placed. That plaintiff cannot now recapture what the applicant gave up in the Patent Office in order to secure the issuance of the "001 patent" is universally recognized under the doctrine of file wrapper estoppel.

The law on this point is fundamental and well settled. As was said by the Supreme Court, most recently, in Calmar, Inc. v. Cook Chemical Co., reported with Graham v. John Deere Co., 383 U.S. 1, 26 at 33–34, 86 S.Ct. 684, at 702, 15 L. Ed.2d 545 (1966):

> "It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. Hogg v. Emerson, 11 How. 587, [13 L.Ed. 824] (1850); Crawford v. Heysinger, 123 U.S. 589, [8 S.Ct. 399, 31 L.Ed. 269] (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; *and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.* Powers-Kennedy [Contracting] Co. v. Concrete [Mixing & Conveying] Co., 282 U.S. 175, 185–186 [51 S.Ct. 95, 99, 75 L.Ed. 278] (1930); Schriber[-Schroth] Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221 [312 U.S. 654, 61 S.Ct. 235, 239–240, 85 L.Ed. 132] (1940).
>
> "Here, the *patentee obtained his patent only by accepting the limita-*

10. The prior art considered by the Patent Office was Hinsky patent No. 1,956,575 (DX A–1), Brillhart Patent No. 2,119,570 (DX A–2) and Berggren Patent No. 2,608,718. I do not deem it necessary to discuss these other than to adopt the examiner's findings with which I entirely agree:

> "The indenting rollers of *Hinsky may be located anywhere along the conduit to be indented.* Applicant refers (page 1, lines 12–18) to *the common practice of indenting the conduit sheaths before vulcanization.* With an apparatus consisting of a vulcanization chamber attached to the extruder, *the obvious place to install the indenting rollers would be within the vulcanizer near the extruder.* It would *not be invention to locate the indenting* rollers of Hinsky in the vulcanizing chamber 40 of Brillhart or 26 (right) of Berggren. When so installed, they will be heated to the vulcanizing temperature by the surrounding atmosphere and will operate in the same manner to produce the same result as in the device applicant claims."
> (emphasis added)

*tions imposed by the Examiner.* The claims were carefully drafted to reflect these limitations and *Cook Chemical is not now free to assert a broader view of Scoggin's invention.* The subject matter as a whole reduces, then, to the distinguishing features clearly incorporated into the claims. We now turn to those features." (emphasis added)

In Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221, 61 S. Ct. 235, 239–240, 85 L.Ed. 132 (1940), cited in the *Calmar* case, *supra,* the Supreme Court had earlier stated the same principle, as follows:

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. [citing cases] The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer. [citing cases] The injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest."

The Court of Appeals for this Circuit, in General Instrument Corp. v. Hughes Aircraft Co., 399 F.2d 373, 385 (1st Cir. 1968), stated the significance of the file wrapper estoppel doctrine as follows:

"A reviewing court—and a trial court—must therefore scrutinize the Patent Office proceedings with as much care as it does the disclosures and claims in the patent itself. Moreover, what is at issue is not merely a contest between the parties but a public interest that cancelled or rejected claims not be revived and restored."

See also Borg-Warner Corp. v. Paragon Gear Works, Inc., 355 F.2d 400, 405–406 (1st Cir. 1965), cert. denied, 384 U.S. 935 86 S.Ct. 1461, 16 L.Ed.2d 536 (1966).

Plaintiff attempts to escape the rigor of the file wrapper estoppel doctrine here, in order to recapture the initial broader claims, on the basis that:

"These patents [see n. 10, *supra*] were relied upon by the Patent Office Examiner in initially rejecting the Lewis, et al. application, but the Examiner subsequently withdrew this rejection in the face of arguments pointing out why the rejection was unsound and the patent was ultimately allowed."

I find no basis for such a statement in the record. On the contrary, all of the applicant's claims which were directed to indent printing inside a CV tube while the cable was in a plastic state were rejected and ultimately cancelled by the applicant. The *allowed* claims require specific pretreatment by the vulcanizing atmosphere prior to marking, in contrast to the *disallowed* claims which set forth a general concept of indent printing within a continuous vulcanizer tube.

 It appears to me that the only reasonable conclusion that can be drawn from the file history of the "001 patent" is that the applicant narrowed his claims, in terms of the location of the marking wheel, in direct response to the prior rejection of broader claims for obviousness. This was not a voluntary, self-imposed restriction, in which case file wrapper estoppel might not be applicable, but rather was an attempt by the applicant to distinguish his claims from the prior art. As such, this is a classic file wrapper estoppel situation, even if the Examiner's conclusion that narrowing was required was erroneous. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 137, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Carter Products, Inc. v. Colgate-Palmolive Co., 269 F.2d 299 (4th Cir. 1959). I reiterate, however, that the finding of obviousness by the Examiner

as to the original application claims seems clearly correct, so that even if plaintiff could recapture the broader claims it would be unavailing, for they would be invalid for lack of invention.

## D. *Presumption of Validity*

I reach the above conclusions of invalidity with complete awareness of the statutorily-mandated presumption of validity which arises from the issuance of a patent by the Patent Office.[11] The weakness of that presumption was indicated by our own appellate court as follows:

"The presumption of validity may not be a very strong presumption but it places some burden other than forensic upon an infringer."

Wilson Research Corp. v. Piolite Plastics Corp., 327 F.2d 139, 140 (1st Cir. 1963). Cf. Parkway Furniture Mfg. Co. v. Dav-O-Niter Corp., 132 F.Supp. 37, 38 (D.Mass.1955) (Aldrich, J.) See also Sherman v. Moore Fabrics, Inc., 179 F. Supp. 74, 80 (D.R.I.1959):

"While it is true that a presumption of validity attaches to every patent, 35 U.S.C.A. § 282, it is well settled that 'the presumption of validity is hardly more than a procedural device to establish a prima facie case that cannot survive in the face of undisputed facts showing there is no invention.' [citing case] And this is particularly true where, as here, some of the prior art * * * was not considered by the Patent Office."

The Second Circuit Court of Appeals in Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2d Cir. 1962), said:

"Appellant places great weight on the presumption of validity attached by statute to a duly issued patent (35 U. S.C. § 282 (1958)). The presumption of validity relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, and places the burden of establishing invalidity on the alleged infringer who asserts it. [citations omitted] More than that, the most that can be said of the presumption is that it requires that reasonable doubt on the question of validity be resolved in favor of the patent holder. [citing case] The statute does not require that the presumption be accorded the weight of actual evidence or that the use of the presumption should affect a decision of invalidity that would otherwise be reached with confidence. This court has recognized the unavoidable obstacles to an accurate and impartial decision that are inherent in ex parte proceedings in the patent office. [citing case] We cannot properly allow decisions of that office to alter the preponderance of the evidence on the question of validity."

All of these authorities, and numerous others, point to the fact that the presumption of validity may be readily overcome, especially where the court has before it evidence which was not before the Patent Office. In this case, the activities of the Cornish Wire Company's

11. That provision is in part as follows:
"§ 282. *Presumption of validity; defenses*
A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.
The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,
(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,
(4) Any other fact or act made a defense by this title."

Williamstown plant were unknown to the Examiner. Therefore, on the question of the patent's novelty, the presumption becomes meaningless. As to the sufficiency of the claims, as measured by § 112, there is nothing to indicate that the Examiner was aware that the narrowed claims recited indeterminable points of location for the various changes which the cable undergoes in the steam chamber, and again the presumption of validity disappears. I simply find, therefore, that the presumption of validity of the "001 patent" has been sufficiently overcome here by the introduction of evidence bearing upon the patent's invalidity which was not in the knowledge of the Patent Office.

## INFRINGEMENT

Assuming *arguendo* that this Court has wrongly decided the question of obviousness and assuming in addition that this Court's findings that for several reasons the patent claims lack novelty is also erroneous, and finally, assuming this Court was in error in its finding of indefiniteness, then I will now consider the claimed infringement of plaintiff's patent by the accused machines belonging to defendant. Prior to July 1, 1967 defendant employed a marking wheel located inside a steam chamber in a CV line at a distance of about 20 feet from the extruder. After that date and up to the present, the distance was reduced to 15 inches. Plaintiff contends that both machines infringe each of the 7 claims in the "001 patent."

I find that there has simply been a failure of proof here by plaintiff. Even if the claims themselves are sufficiently definite, plaintiff's own expert can point to no certain and measurable way to determine whether either or both of defendant's machines fall within the boundaries of those claims. It simply has not been shown that by placing the marking wheel at either 15 inches or 20 feet, any of the claims is literally infringed, and since plaintiff is estopped to claim broader limits upon his invention (e.g., *anywhere* in the CV line), it must follow that infringement has not been proved in the case before me. Parenthetically, I note that this failure of proof is directly attributable to the indefiniteness of the claims, *supra*.

Order to be entered accordingly.